MORTON H. MEINHARD, Respondent, *v.* WALTER J. SALMON et al., Appellants.

(Argued December 4, 1928; decided December 31, 1928.)

*Nathan L. Miller, Harold Otis* and *Walter H. Bond* for appellants.   Under the terms of the Salmon-Meinhard agreement Meinhard had no interest in Salmon's expectancy of renewal of the Bristol lease.   (*Lobsitz* v. *Lissberger Co.,* 168 App. Div. 840; *Jones* v. *Gould,* 209 N. Y. 419; *Heye* v. *Tilford,* 2 App. Div. 346; 154 N. Y. 757; *London Assurance Co.* v. *Drennen,* 116 U. S. 461; *McPhillips* v. *Fitzgerald,* 76 App. Div. 15; 177 N. Y. 543; *Russell* v. *Herrick,* 127 App. Div. 503; *Ketchum* v. *Clark,* 6 Johns. 144; *Marquard* v. *N. Y. Mfg. Co.,* 17 Johns. 525; *Waring* v. *Robinson,* 1 Hoff. Ch. 524; *Bank* v. *Carrollton Railroad,* 11 Wall. 624.)   The Midpoint lease was not in the nature of a renewal of the Bristol lease.   (*Harris* v. *Bedell Co.,* 248 N. Y. 109.)   If Meinhard had a half interest in Salmon's expectancy of renewal of the Bristol lease and if the Midpoint lease comprehended a renewal of the Bristol lease, then Meinhard would be entitled only to a half interest in that part or proportion of the Midpoint lease constituting such renewal.   (*The Idaho,* 93 U. S. 575; *Ryder* v. *Hathaway,* 21 Pick. 298; *Acheson* v. *Fair,* 3 Dru. & W. 512; 2 Con. & L. 298; *O'Brien* v. *Egan,* 5 L. R. Ir. Ch. 633.)

*John W. Davis, Ralph Wolf, Edwin D. Hays* and *Samuel R. Feller* for respondent.   In view of the fiduciary relationship existing between the parties in respect of their ownership of the Bristol lease, neither party could obtain a renewal thereof for his sole benefit.   (*Mitchell* v. *Reed,* 61 N. Y. 123; *Robinson* v. *Jewett,* 116 N. Y. 40; *Thayer* v. *Leggett,* 229 N. Y. 152; *Selwyn* v. *Waller,* 212 N. Y. 507; *Beatty* v. *Guggenheim Exploration Co.,* 225 N. Y. 380; *Essex* v. *Enwright,* 214 Mass. 507; *Trice* v. *Comstock,* 121 Fed. Rep. 620; *Blakeslee* v. *Sottile,* 118 Misc. Rep. 513.)   Defendant has not shown that the fiduciary

relationship existing between the parties was terminated at any time. (*Brady* v. *Erlanger*, 165 App. Div. 29; *New York Bank Note Co.* v. *Hamilton Bank Note Co.*, 180 N. Y. 280; *Barguilo* v. *California Wineries*, 103 Misc. Rep. 691.) By the express terms of the agreement of May 19, 1902, plaintiff was entitled to " fifty per centum of the net profits arising or growing out of the leased premises." It being conceded on the record that the renewal lease obtained by the defendant is valuable, said renewal lease represents a " profit arising or growing out of said leased premises." (*Mayer* v. *Nethersole*, 71 App. Div. 383; *Eyster* v. *Centennial Board of Finance*, 94 U. S. 500; *Jones* v. *Davis*, 48 N. J. Eq. 493.) The defendant is not aided because the owner planned to lease to him both plot A and plot B under one lease, with a common building, or because the owner negotiated with others and finally turned to the defendant to conclude the lease. (*Beatty* v. *Guggenheim Exploration Co.*, 225 N. Y. 380.) Meinhard's rights are not affected by the fact that the Midpoint lease is upon other or different terms than the Bristol lease. (*Selwyn* v. *Waller*, 212 N. Y. 507; *Maas* v. *Goldman*, 122 Misc. Rep. 221; 210 App. Div. 845.) Plaintiff is entitled to a one-half interest in the property covered by the Midpoint lease. (*Beatty* v. *Guggenheim Exploration Co.*, 225 N. Y. 380; *Holmes* v. *Gilman*, 138 N. Y. 369.)

CARDOZO, Ch. J.   On April 10, 1902, Louisa M. Gerry leased to the defendant Walter J. Salmon the premises known as the Hotel Bristol at the northwest corner of Forty-second street and Fifth avenue in the city of New York.   The lease was for a term of twenty years, commencing May 1, 1902, and ending April 30, 1922. The lessee undertook to change the hotel building for use as shops and offices at a cost of $200,000. Alterations and additions were to be accretions to the land.

Salmon, while in course of treaty with the lessor as to execution of the lease, was in course of treaty with

Meinhard, the plaintiff, for the necessary funds. The result was a joint venture with terms embodied in a writing. Meinhard was to pay to Salmon half of the moneys requisite to reconstruct, alter, manage and operate the property. Salmon was to pay to Meinhard 40 per cent of the net profits for the first five years of the lease and 50 per cent for the years thereafter. If there were losses, each party was to bear them equally. Salmon, however, was to have sole power to "manage, lease, underlet and operate" the building. There were to be certain pre-emptive rights for each in the contingency of death.

The two were coadventurers, subject to fiduciary duties akin to those of partners (*King* v. *Barnes*, 109 N. Y. 267). As to this we are all agreed. The heavier weight of duty rested, however, upon Salmon. He was a coadventurer with Meinhard, but he was manager as well. During the early years of the enterprise, the building, reconstructed, was operated at a loss. If the relation had then ended, Meinhard as well as Salmon would have carried a heavy burden. Later the profits became large with the result that for each of the investors there came a rich return. For each, the venture had its phases of fair weather and of foul. The two were in it jointly, for better or for worse.

When the lease was near its end, Elbridge T. Gerry had become the owner of the reversion. He owned much other property in the neighborhood, one lot adjoining the Bristol Building on Fifth avenue and four lots on Fortysecond street. He had a plan to lease the entire tract for a long term to some one who would destroy the buildings then existing, and put up another in their place. In the latter part of 1921, he submitted such a project to several capitalists and dealers. He was unable to carry it through with any of them. Then, in January, 1922, with less than four months of the lease to run, he approached the defendant Salmon. The result was a new lease to the Midpoint Realty Company, which is owned and controlled by Salmon, a lease covering the

whole tract, and involving a huge outlay. The term is to be twenty years, but successive covenants for renewal will extend it to a maximum of eighty years at the will of either party. The existing buildings may remain unchanged for seven years. They are then to be torn down, and a new building to cost $3,000,000 is to be placed upon the site. The rental, which under the Bristol lease was only $55,000, is to be from $350,000 to $475,000 for the properties so combined. Salmon personally guaranteed the performance by the lessee of the covenants of the new lease until such time as the new building had been completed and fully paid for.

The lease between Gerry and the Midpoint Realty Company was signed and delivered on January 25, 1922. Salmon had not told Meinhard anything about it. Whatever his motive may have been, he had kept the negotiations to himself. Meinhard was not informed even of the bare existence of a project. The first that he knew of it was in February when the lease was an accomplished fact. He then made demand on the defendants that the lease be held in trust as an asset of the venture, making offer upon the trial to share the personal obligations incidental to the guaranty. The demand was followed by refusal, and later by this suit. A referee gave judgment for the plaintiff, limiting the plaintiff's interest in the lease, however, to 25 per cent. The limitation was on the theory that the plaintiff's equity was to be restricted to one-half of so much of the value of the lease as was contributed or represented by the occupation of the Bristol site. Upon cross-appeals to the Appellate Division, the judgment was modified so as to enlarge the equitable interest to one-half of the whole lease. With this enlargement of plaintiff's interest, there went, of course, a corresponding enlargement of his attendant obligations. The case is now here on an appeal by the defendants.

Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest

loyalty. ⎰ Many forms of conduct permissible in a worka-
day world for those acting at arm's length, are forbidden
to those bound by fiduciary ties.⎱ A trustee is held to
something stricter than the morals of the market place.
Not honesty alone, but the punctilio of an honor the most
sensitive, is then the standard of behavior. As to this
there has developed a tradition that is unbending and
inveterate. ⎡Uncompromising rigidity has been the
attitude of courts of equity when petitioned to undermine
the rule of undivided loyalty by the " disintegrating
erosion " of particular exceptions⎤ (*Wendt* v. *Fischer*, 243
N. Y. 439, 444). ⎰Only thus has the level of conduct for
fiduciaries been kept at a level higher than that trodden
by the crowd. It will not consciously be lowered by any
judgment of this court. ⎱

The owner of the reversion, Mr. Gerry, had vainly
striven to find a tenant who would favor his ambitious
scheme of demolition and construction. Baffled in the
search, he turned to the defendant Salmon in possession
of the Bristol, the keystone of the project. He figured
to himself beyond a doubt that the man in possession
would prove a likely customer. To the eye of an observer,
Salmon held the lease as owner in his own right, for
himself and no one else. In fact he held it as a fiduciary,
for himself and another, sharers in a common venture.
If this fact had been proclaimed, if the lease by its terms
had run in favor of a partnership, Mr. Gerry, we may
fairly assume, would have laid before the partners, and
not merely before one of them, his plan of reconstruction.
The pre-emptive privilege, or, better, the pre-emptive
opportunity, that was thus an incident of the enterprise,
Salmon appropriated to himself in secrecy and silence.
He might have warned Meinhard that the plan had been
submitted, and that either would be free to compete for
the award. If he had done this, we do not need to say
whether he would have been under a duty, if successful
in the competition, to hold the lease so acquired for the

benefit of a venture then about to end, and thus prolong by indirection its responsibilities and duties. The trouble about his conduct is that he excluded his coadventurer from any chance to compete, from any chance to enjoy the opportunity for benefit that had come to him alone by virtue of his agency. This chance, if nothing more, he was under a duty to concede. The price of its denial is an extension of the trust at the option and for the benefit of the one whom he excluded.

No answer is it to say that the chance would have been of little value even if seasonably offered. Such a calculus of probabilities is beyond the science of the chancery. Salmon, the real estate operator, might have been preferred to Meinhard, the woolen merchant. On the other hand, Meinhard might have offered better terms, or reinforced his offer by alliance with the wealth of others. Perhaps he might even have persuaded the lessor to renew the Bristol lease alone, postponing for a time, in return for higher rentals, the improvement of adjoining lots. We know that even under the lease as made the time for the enlargement of the building was delayed for seven years. All these opportunities were cut away from him through another's intervention. He knew that Salmon was the manager. As the time drew near for the expiration of the lease, he would naturally assume from silence, if from nothing else, that the lessor was willing to extend it for a term of years, or at least to let it stand as a lease from year to year. Not impossibly the lessor would have done so, whatever his protestations of unwillingness, if Salmon had not given assent to a project more attractive. At all events, notice of termination, even if not necessary, might seem, not unreasonably, to be something to be looked for, if the business was over and another tenant was to enter. In the absence of such notice, the matter of an extension was one that would naturally be attended to by the manager of the enterprise, and not neglected altogether. At least, there was nothing in the situation to give warning to any one that while the lease was still in being, there

had come to the manager an offer of extension which he had locked within his breast to be utilized by himself alone. The very fact that Salmon was in control with exclusive powers of direction charged him the more obviously with the duty of disclosure, since only through disclosure could opportunity be equalized. If he might cut off renewal by a purchase for his own benefit when four months were to pass before the lease would have an end, he might do so with equal right while there remained as many years (cf. *Mitchell* v. *Reed*, 61 N. Y. 123, 127). He might steal a march on his comrade under cover of the darkness, and then hold the captured ground. Loyalty and comradeship are not so easily abjured.

Little profit will come from a dissection of the precedents. None precisely similar is cited in the briefs of counsel. What is similar in many, or so it seems to us, is the animating principle. Authority is, of course, abundant that one partner may not appropriate to his own use a renewal of a lease, though its term is to begin at the expiration of the partnership (*Mitchell* v. *Reed*, 61 N. Y. 123; 84 N. Y. 556). The lease at hand with its many changes is not strictly a renewal. Even so, the standard of loyalty for those in trust relations is without the fixed divisions of a graduated scale. There is indeed a dictum in one of our decisions that a partner, though he may not renew a lease, may purchase the reversion if he acts openly and fairly (*Anderson* v. *Lemon*, 8 N. Y. 236; cf. White & Tudor, Leading Cases in Equity [9th ed.], vol. 2, p. 642; *Bevan* v. *Webb*, 1905, 1 Ch. 620; *Griffith* v. *Owen*, 1907, 1 Ch. 195, 204, 205). It is a dictum, and no more, for on the ground that he had acted slyly he was charged as a trustee. The holding is thus in favor of the conclusion that a purchase as well as a lease will succumb to the infection of secrecy and silence. Against the dictum in that case, moreover, may be set the opinion of DWIGHT, C., in *Mitchell* v. *Read*, where there is a dictum to the contrary (61 N. Y. at p. 143).

To say that a partner is free without restriction to buy in the reversion of the property where the business is conducted is to say in effect that he may strip the good will of its chief element of value, since good will is largely dependent upon continuity of possession (*Matter of Brown*, 242 N. Y. 1, 7.) Equity refuses to confine within the bounds of classified transactions its precept of a loyalty that is undivided and unselfish. Certain at least it is that a " man obtaining his *locus standi*, and his opportunity for making such arrangements, by the position he occupies as a partner, is bound by his obligation to his co-partners in such dealings not to separate his interest from theirs, but, if he acquires any benefit, to communicate it to them " (*Cassels* v. *Stewart*, 6 App. Cas. 64, 73). Certain it is also that there may be no abuse of special opportunities growing out of a special trust as manager or agent (*Matter of Biss*, 1903, 2 Ch. 40; *Clegg* v. *Edmondson*, 8 D. M. & G. 787, 807). If conflicting inferences are possible as to abuse or opportunity, the trier of the facts must make the choice between them. There can be no revision in this court unless the choice is clearly wrong. It is no answer for the fiduciary to say " that he was not bound to risk his money as he did, or to go into the enterprise at all " (*Beatty* v. *Guggenheim Exploration Co.*, 225 N. Y. 380, 385). " He might have kept out of it altogether, but if he went in, he could not withhold from his employer the benefit of the bargain " (*Beatty* v. *Guggenheim Exploration Co.*, supra). A constructive trust is then the remedial device through which preference of self is made subordinate to loyalty to others (*Beatty* v. *Guggenheim Exploration Co.*, supra). Many and varied are its phases and occasions (*Selwyn & Co.* v. *Waller*, 212 N. Y. 507, 512; *Robinson* v. *Jewett*, 116 N. Y. 40; cf. *Tournier* v. *Nat. Prov. & Union Bank*, 1924, 1 K. B. 461).

We have no thought to hold that Salmon was guilty of a conscious purpose to defraud. Very likely he assumed

in all good faith that with the approaching end of the venture he might ignore his coadventurer and take the extension for himself. He had given to the enterprise time and labor as well as money. He had made it a success. Meinhard, who had given money; but neither time nor labor, had already been richly paid. There might seem to be something grasping in his insistence upon more. Such recriminations are not unusual when coadventurers fall out. They are not without their force if conduct is to be judged by the common standards of competitors. That is not to say that they have pertinency here. Salmon had put himself in a position in which thought of self was to be renounced, however hard the abnegation. He was much more than a coadventurer. He was a managing coadventurer (*Clegg* v. *Edmondson*, 8 D. M. & G. 787, 807). For him and for those like him, the rule of undivided loyalty is relentless and supreme (*Wendt* v. *Fischer, supra; Munson* v. *Syracuse, etc., R: R. Co.*, 103 N. Y. 58, 74). A different question would be here if there were lacking any nexus of relation between the business conducted by the manager and the opportunity brought to him as an incident of management (*Dean* v. *MacDowell*, 8 Ch. D. 345, 354; *Aas* v. *Benham*, 1891, 2 Ch. 244, 258; *Latta* v. *Kilbourn*, 150 U. S. 524). For this problem, as for most, there are distinctions of degree. If Salmon had received from Gerry a proposition to lease a building at a location far removed, he might have held for himself the privilege thus acquired, or so we shall assume. Here the subject-matter of the new lease was an extension and enlargement of the subject-matter of the old one. A managing coadventurer appropriating the benefit of such a lease without warning to his partner might fairly expect to be reproached with conduct that was underhand, or lacking, to say the least, in reasonable candor, if the partner were to surprise him in the act of signing the new instrument. Conduct subject to that reproach does not receive from equity a healing benediction

A question remains as to the form and extent of the equitable interest to be allotted to the plaintiff. The trust as declared has been held to attach to the lease which was in the name of the defendant corporation. We think it ought to attach at the option of the defendant Salmon to the shares of stock which were owned by him or were under his control. The difference may be important if the lessee shall wish to execute an assignment of the lease, as it ought to be free to do with the consent of the lessor. On the other hand, an equal division of the shares might lead to other hardships. It might take away from Salmon the power of control and management which under the plan of the joint venture he was to have from first to last. The number of shares to be allotted to the plaintiff should, therefore, be reduced to such an extent as may be necessary to preserve to the defendant Salmon the expected measure of dominion. To that end an extra share should be added to his half.

Subject to this adjustment, we agree with the Appellate Division that the plaintiff's equitable interest is to be measured by the value of half of the entire lease, and not merely by half of some undivided part. A single building covers the whole area. Physical division is impracticable along the lines of the Bristol site, the keystone of the whole. Division of interests and burdens is equally impracticable. Salmon, as tenant under the new lease, or as guarantor of the performance of the tenant's obligations, might well protest if Meinhard, claiming an equitable interest, had offered to assume a liability not equal to Salmon's, but only half as great. He might justly insist that the lease must be accepted by his coadventurer in such form as it had been given, and not constructively divided into imaginary fragments. What must be yielded to the one may be demanded by the other. The lease as it has been executed is single and entire. If confusion has resulted from the union of adjoining parcels, the trustee who consented to the

union must bear the inconvenience (*Hart* v. *Ten Eyck*, 2 Johns. Ch. 62).

Thus far, the case has been considered on the assumption that the interest in the joint venture acquired by the plaintiff in 1902 has been continuously his. The fact is, however, that in 1917 he assigned to his wife all his " right, title and interest in and to " the agreement with his coadventurer. The coadventurer did not object, but thereafter made his payments directly to the wife. There was a reassignment by the wife before this action was begun.

We do not need to determine what the effect of the assignment would have been in 1917 if either coadventurer had then chosen to treat the venture as dissolved. We do not even need to determine what the effect would have been if the enterprise had been a partnership in the strict sense with active duties of agency laid on each of the two adventurers The form of the enterprise made Salmon the sole manager. The only active duty laid upon the other was one wholly ministerial, the duty of contributing his share of the expense. This he could still do with equal readiness, and still was bound to do, after the assignment to his wife. Neither by word nor by act did either partner manifest a choice to view the enterprise as ended. There is no inflexible rule in such conditions that dissolution shall ensue against the concurring wish of all that the venture shall continue. The effect of the assignment is then a question of intention (*Durkee* v. *Gunn*, 41 Kan. 496, 500; *Taft* v. *Buffum*, 14 Pick. 322; cf. 69 A. S. R. 417, and cases there cited).

Partnership Law (Cons. Laws, ch. 39), section 53, subdivision 1, is to the effect that " a conveyance by a partner of his interest in the partnership does not of itself dissolve the partnership, nor, as against the other partners in the absence of agreement, entitle the assignee, during the continuance of the partnership, to interfere in the management or administration of the

partnership business or affairs, or to require any information or account of partnership transactions, or to inspect the partnership books; but it merely entitles the assignee to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled." This statute, which took effect October 1, 1919, did not indeed revive the enterprise if automatically on the execution of the assignment a dissolution had resulted in 1917. It sums up with precision, however, the effect of the assignment as the parties meant to shape it. We are to interpret their relation in the revealing light of conduct. The rule of the statute, even if it has modified the rule as to partnerships in general (as to this see Pollock, Partnership, p. 99, § 31; Lindley, Partnership [9th ed.], 695; *Marquand* v. *N. Y. M. Co.*, 17 Johns. 525), is an accurate statement of the rule at common law when applied to these adventurers. The purpose of the assignment, understood by every one concerned, was to lower the plaintiff's tax by taking income out of his return and adding it to the return to be made by his wife. She was the appointee of the profits, to whom checks were to be remitted. Beyond that, the relation was to be the same as it had been. No one dreamed for a moment that the enterprise was to be wound up, or that Meinhard was relieved of his continuing obligation to contribute to its expenses if contribution became needful. Coadventurers and assignee, and most of all the defendant Salmon, as appears by his own letters, went forward on that basis. For more than five years Salmon dealt with Meinhard on the assumption that the enterprise was a subsisting one with mutual rights and duties, or so at least the triers of the facts, weighing the circumstantial evidence, might not unreasonably infer. By tacit, if not express approval, he continued and preserved it. We think it is too late now, when charged as a trustee, to come forward with the claim that it had been disrupted and dissolved.

The judgment should be modified by providing that at the option of the defendant Salmon there may be substituted for a trust attaching to the lease a trust attaching to the shares of stock, with the result that one-half of such shares together with one additional share will in that event be allotted to the defendant Salmon and the other shares to the plaintiff, and as so modified the judgment should be affirmed with costs.

ANDREWS, J. (dissenting).  A tenant's expectancy of the renewal of a lease is a thing, tenuous, yet often having a real value.  It represents the probability that a landlord will prefer to relet his premises to one already in possession rather than to strangers.  Less tangible than " good will " it is never included in the tenant's assets, yet equity will not permit one standing in a relation of trust and confidence toward the tenant unfairly to take the benefit to himself.  At times the principle is rigidly enforced.  Given the relation between the parties, a certain result follows.  No question as to good faith, or injury, or as to other circumstances is material.  Such is the rule as between trustee and *cestui* (*Keich* v. *Sanford*, Select Cas. in Ch. 61); as between executor and estate (*Matter of Brown*, 18 Ch. Div. 61); as between guardian and ward (*Milner* v. *Harewood*, 18 Ves. 259, 274).

At other times some inquiry is allowed as to the facts involved.  Fair dealing and a scrupulous regard for honesty is required.  But nothing more.  It may be stated generally that a partner may not for his own benefit secretly take a renewal of a firm lease to himself. (*Mitchell* v. *Reed*, 61 N. Y. 123.)  Yet under very exceptional circumstances this may not be wholly true.  (W. & T. Leading Cas. in Equity [9th ed.], p. 657; *Clegg* v. *Edmondson*, 8 D. M. & G. 787, 807.)  In the case of tenants in common there is still greater liberty.  There is said to be a distinction between those holding under a will or through descent and those holding under inde-

pendent conveyance. But even in the former situation the bare relationship is not conclusive. (*Matter of Biss,* 1903, 2 Ch. 40). In *Burrell* v. *Bull* (3 Sand. Ch. 15) there was actual fraud. In short, as we once said, " the elements of actual fraud — of the betrayal by secret action of confidence reposed, or assumed to be reposed, grows in importance as the relation between the parties falls from an express to an implied or a quasi trust, and on to those cases where good faith alone is involved." (*Thayer* v. *Leggett,* 229 N. Y. 152.)

Where the trustee, or the partner or the tenant in common, takes no new lease but buys the reversion in good faith a somewhat different question arises. Here is no direct appropriation of the expectancy of renewal. Here is no offshoot of the original lease. We so held in *Anderson* v. *Lemon* (8 N. Y. 236), and although Judge Dwight casts some doubt on the rule in *Mitchell* v. *Reed,* it seems to have the support of authority. (W. & T. Leading Cas. in Equity, p. 650; Lindley on Partnership [9th ed.], p. 396; *Bevan* v. *Webb,* 1905, 1 Ch. 620.) The issue then is whether actual fraud, dishonesty, unfairness is present in the transaction. If so, the purchaser may well be held as a trustee. (*Anderson* v. *Lemon,* cited above.)

With this view of the law I am of the opinion that the issue here is simple. Was the transaction in view of all the circumstances surrounding it unfair and inequitable? I reach this conclusion for two reasons. There was no general partnership, merely a joint venture for a limited object, to end at a fixed time. The new lease, covering additional property, containing many new and unusual terms and conditions, with a possible duration of eighty years, was more nearly the purchase of the reversion than the ordinary renewal with which the authorities are concerned.

The findings of the referee are to the effect that before 1902, Mrs. Louisa M. Gerry was the owner of a plot on

the corner of Fifth avenue and Forty-second street, New York, containing 9,312 square feet. On it had been built the old Bristol Hotel. Walter J. Salmon was in the real estate business, renting, managing and operating buildings. On April 10th of that year Mrs. Gerry leased the property to him for a term extending from May 1, 1902, to April 30, 1922. The property was to be used for offices and business, and the design was that the lessee should so remodel the hotel at his own expense as to fit it for such purposes, all alterations and additions, however, at once to become the property of the lessor. The lease might not be assigned without written consent.

Morton H. Meinhard was a woolen merchant. At some period during the negotiations between Mr. Salmon and Mrs. Gerry, so far as the findings show without the latter's knowledge, he became interested in the transaction. Before the lease was executed he advanced $5,000 toward the cost of the proposed alterations. Finally, on May 19th he and Salmon entered into a written agreement. " During the period of twenty years from the 1st day of May, 1902," the parties agree to share equally in the expense needed " to reconstruct, alter, manage and operate the Bristol Hotel property; " and in all payments required by the lease, and in all losses incurred " during the full term of the lease, i. e., from the first day of May, 1902, to the 1st day of May, 1922." During the same term net profits are to be divided. Mr. Salmon has sole power to " manage, lease, underlet and operate " the premises. If he dies, Mr. Meinhard shall be consulted before any disposition is made of the lease, and if Mr. Salmon's representatives decide to dispose of it, and the decision is theirs, Mr. Meinhard is to be given the first chance to take the unexpired term upon the same conditions they could obtain from others.

The referee finds that this arrangement did not create a partnership between Mr. Salmon and Mr. Meinhard. In this he is clearly right. He is equally right in holding

that while no general partnership existed the two men had entered into a joint adventure and that while the legal title to the lease was in Mr. Salmon, Mr. Meinhard had some sort of an equitable interest therein. Mr. Salmon was to manage the property for their oint benefit. He was bound to use good faith. He could not willfully destroy the lease, the object of the adventure, to the detriment of Mr. Meinhard.

Mr. Salmon went into possession and control of the property. The alterations were made. At first came losses. Then large profits which were duly distributed. At all times Mr. Salmon has acted as manager.

Some time before 1922 Mr. Elbridge T. Gerry became the owner of the reversion. He was already the owner of an adjoining lot on Fifth avenue and of four lots adjoining on Forty-second street, in all 11,587 square feet, covered by five separate buildings. Obviously all this property together was more valuable than the sum of the value of the separate parcels. Some plan to develop the property as a whole seems to have occurred to Mr. Gerry. He arranged that all leases on his five lots should expire on the same day as the Bristol Hotel lease. Then in 1921 he negotiated with various persons and corporations seeking to obtain a desirable tenant who would put up a building to cover the entire tract, for this was the policy he had adopted. These negotiations lasted for some months. They failed. About January 1, 1922, Mr. Gerry's agent approached Mr. Salmon and began to negotiate with him for the lease of the entire tract. Upon this he insisted as he did upon the erection of a new and expensive building covering the whole. He would not consent to the renewal of the Bristol lease on any terms. This effort resulted in a lease to the Midpoint Realty Company, a corporation entirely owned and controlled by Mr. Salmon. For our purposes the paper may be treated as if the agreement was made with Mr. Salmon himself.

In many respects, besides the increase in the land demised, the new lease differs from the old. Instead of an annual rent of $55,000 it is now from $350,000 to $475,000. Instead of a fixed term of twenty years it may now be, at the lessee's option, eighty. Instead of alterations in an existing structure costing about $200,000 a new building is contemplated costing $3,000,000. Of this sum $1,500,000 is to be advanced by the lessor to the lessee, "but not to its successors or assigns," and is to be repaid in installments. Again no assignment or sale of the lease may be made without the consent of the lessor.

This lease is valuable. In making it Mr. Gerry acted in good faith without any collusion with Mr. Salmon and with no purpose to deprive Mr. Meinhard of any equities he might have. But as to the negotiations leading to it or as to the execution of the lease itself Mr. Meinhard knew nothing. Mr. Salmon acted for himself to acquire the lease for his own benefit.

Under these circumstances the referee has found and the Appellate Division agrees with him, that Mr. Meinhard is entitled to an interest in the second lease, he having promptly elected to assume his share of the liabilities imposed thereby. This conclusion is based upon the proposition that under the original contract between the two men " the enterprise was a joint venture, the relation between the parties was fiduciary and governed by principles applicable to partnerships," therefore, as the new lease is a graft upon the old, Mr. Salmon might not acquire its benefits for himself alone.

Were this a general partnership between Mr. Salmon and Mr. Meinhard I should have little doubt as to the correctness of this result assuming the new lease to be an offshoot of the old. Such a situation involves questions of trust and confidence to a high degree; it involves questions of good will; many other considerations. As has been said, rarely if ever may one partner without the knowledge of the other acquire for himself the renewal of

a lease held by the firm, even if the new lease is to begin after the firm is dissolved. Warning of such an intent, if he is managing partner, may not be sufficient to prevent the application of this rule.

We have here a different situation governed by less drastic principles. I assume that where parties engage in a joint enterprise each owes to the other the duty of the utmost good faith in all that relates to their common venture. Within its scope they stand in a fiduciary relationship. I assume *prima facie* that even as between joint adventurers one may not secretly obtain a renewal of the lease of property actually used in the joint adventure where the possibility of renewal is expressly or impliedly involved in the enterprise. I assume also that Mr. Meinhard had an equitable interest in the Bristol Hotel lease. Further, that an expectancy of renewal inhered in that lease. Two questions then arise. Under his contract did he share in that expectancy? And if so, did that expectancy mature into a graft of. the original lease? To both questions my answer is " no."

The one complaint made is that Mr. Salmon obtained the new lease without informing Mr. Meinhard of his intention. Nothing else. There is no claim of actual fraud. No claim of misrepresentation to any one. Here was no movable property to be acquired by a new tenant at a sacrifice to its owners. No good will, largely dependent on location, built up by the joint efforts of two men. Here was a refusal of the landlord to renew the Bristol lease on any terms; a proposal made by him, not sought by Mr. Salmon, and a choice by him and by the original lessor of the person with whom they wished to deal shown by the covenants against · assignment or underletting, and by their ignorance of the arrangement with Mr. Meinhard. ·

What then was the scope of the adventure into which the two men entered? It is to be remembered that before their contract was signed Mr. Salmon had obtained

the lease of the Bristol property. Very likely the matter had been earlier discussed between them. The $5,000 advance by Mr. Meinhard indicates that fact. But it has been held that the written contract defines their rights and duties.

Having the lease Mr. Salmon assigns no interest in it to Mr. Meinhard. He is to manage the property. It is for him to decide what alterations shall be made and to fix the rents. But for twenty years from May 1, 1902, Salmon is to make all advances from his own funds and Meinhard is to pay him personally on demand one-half of all expenses incurred and all losses sustained " during the full term of said lease," and during the same period Salmon is to pay him a part of the net profits. There was no joint capital provided.

It seems to me that the venture so inaugurated had in view a limited object and was to end at a limited time. There was no intent to expand it into a far greater undertaking lasting for many years. The design was to exploit a particular lease. Doubtless in it Mr. Meinhard had an equitable interest, but in it alone. This interest terminated when the joint adventure terminated. There was no intent that for the benefit of both any advantage should be taken of the chance of renewal — that the adventure should be continued beyond that date. Mr. Salmon has done all he promised to do in return for Mr. Meinhard's undertaking when he distributed profits up to May 1, 1922. Suppose this lease, non-assignable without the consent of the lessor, had contained a renewal option. Could Mr. Meinhard have exercised it? Could he have insisted that Mr. Salmon do so? Had Mr. Salmon done so could he insist that the agreement to share losses still existed or could Mr. Meinhard have claimed that the joint adventure was still to continue for twenty or eighty years? I do not think so. The adventure by its express terms ended on May 1, 1922. The contract by its language and by its whole import excluded

the idea that the tenant's expectancy was to subsist for the benefit of the plaintiff. On that date whatever there was left of value in the lease reverted to Mr. Salmon, as it would had the lease been for thirty years instead of twenty. Any equity which Mr. Meinhard possessed was in the particular lease itself, not in any possibility of renewal. There was nothing unfair in Mr. Salmon's conduct.

I might go further were it necessary. Under the circumstances here presented had the lease run to both the parties I doubt whether the taking by one of a renewal without the knowledge of the other would cause interference by a court of equity. An illustration may clarify my thought. A and B enter into a joint venture to resurface a highway between Albany and Schenectady. They rent a parcel of land for the storage of materials. A, unknown to B, agrees with the lessor to rent that parcel and one adjoining it after the venture is finished, for an iron foundry. Is the act unfair? Would any general statements, scattered here and there through opinions dealing with other circumstance, be thought applicable? In other words, the mere fact that the joint venturers rent property together does not call for the strict rule that applies to general partners. Many things may excuse what is there forbidden. Nor here does any possibility of renewal exist as part of the venture. The nature of the undertaking excludes such an idea.

So far I have treated the new lease as if it were a renewal of the old. As already indicated, I do not take that view. Such a renewal could not be obtained. Any expectancy that it might be had vanished. What Mr. Salmon obtained was not a graft springing from the Bristol lease, but something distinct and different — as distinct as if for a building across Fifth avenue. I think also that in the absence of some fraudulent or unfair act the secret purchase of the reversion even by one partner is rightful. Substantially this is such a purchase. Because of the mere label of a transaction we do not place it on one

side of the line or the other. Here is involved the possession of a large and most valuable unit of property for eighty years, the destruction of all existing structures and the erection of a new and expensive building covering the whole. No fraud, no deceit, no calculated secrecy is found. Simply that the arrangement was made without the knowledge of Mr. Meinhard. I think this not enough.

The judgment of the courts below should be reversed and a new trial ordered, with costs in all courts to abide the event.

POUND, CRANE and LEHMAN, JJ., concur with CARDOZO, Ch. J., for modification of the judgment appealed from and affirmance as modified; ANDREWS, J., dissents in opinion in which KELLOGG and O'BRIEN, JJ., concur.

Judgment modified, etc.