Stanley SAPERY, doing business as Stanley Sapery Company, Plaintiff-Appellee,

v.

ATLANTIC PLASTICS, Inc., Defendant-Appellant.

No. 284, Docket 24912.

United States Court of Appeals
Second Circuit.

Argued May 7, 1958.

Decided Aug. 20, 1958.

George F. Lowman, Stamford, Conn. (Warren W. Eginton, John F. Spindler, Robert T. Gilhuly, Cummings & Lockwood, Stamford, Conn., on the brief), for defendant-appellant.

Donald F. Keefe, New Haven, Conn. (Gumbart, Corbin, Tyler & Cooper, New Haven, Conn., on the brief), for plaintiff-appellee.

Before WATERMAN and MOORE, Circuit Judges, and GALSTON, District Judge.

MOORE, Circuit Judge.

The plaintiff, Stanley Sapery, doing business as Stanley Sapery Company, brought this action for an accounting

and damages based upon an alleged breach of contract to pay commissions. Plaintiff claims that commencing in 1949 and continuing until August 17, 1954, he acted as a manufacturers' sales representative for defendant under a series of contracts in which defendant promised to compensate plaintiff by paying him commissions on certain specified orders and re-orders. The contracts were by letter addressed to plaintiff by defendant and accepted by plaintiff's endorsement thereon. There were twelve such contracts (Exhs. A through L). In substance they provided for the rate of commission for the particular order and re-orders "so long as you are ready, willing and able to adequately service the [named] account."

The critical paragraph insofar as this litigation is concerned reads as follows:

"2. Your commission is to continue on all re-orders for the same item, with the following provisions:

\* \* \* \* \* \*

"b. In the event that you are unable to continue servicing the [S. M. Frank] account, whether for business or personal reasons, Atlantic undertakes to pay you or your representatives, or heirs, 30% of the commission rate in force at the time you cease servicing the account, such commissions to continue for a period not to exceed five years from the date on which you become inoperative."

At the time these contracts were made defendant was a manufacturer of plastic products. Plaintiff was not a manufacturer. He acted solely as a manufacturers' sales agent, selling defendant's products and those of certain other manufacturers in the plastics industry.

In July 1954 plaintiff advised defendant that he had formed his own manufacturing corporation, Augusta Plastics, which would compete with defendant. Plaintiff owned all the stock of Augusta Plastics which was to manufacture injection molded products—the same process used by defendant. Because of this changed relationship in which plaintiff had become a competing manufacturer, plaintiff told defendant that he would continue to service old items and re-orders but that on any new business he would consider himself (Augusta Plastics) first and would prefer his company for new business. Plaintiff also reserved for himself the prerogative of defining new business as "new items, not repeat orders on all old items—any item that is different" (25a). Furthermore plaintiff would thereafter "compete for any new business in that same company," i.e., the very company from which he had theretofore been soliciting orders for defendant (30a).

Faced with this situation defendant, on August 17, 1954, notified plaintiff in writing that:

"Your entry into the injection molding field places you in a position of divided loyalty which makes it impossible for you to continue to adequately service our accounts. In this connection, it should be added that we are mindful of the fact that while you have been representing us, you have also represented other injection molders with the understanding, however, that Atlantic Plastics would receive primary consideration. We believe that your entry into the injection molding field will make it impossible for you to give us this primary consideration because you will be in a position of favoring your own company in preference to ours."

Looking "toward concluding our relationship amicably" defendant offered:

"1. To consider your active representation of our company at an end on September 30, 1954;

"2. To pay you full normal commissions on all orders secured for us by your organization and remaining unfilled at September 30, 1954;

"3. To pay you on succeeding re-orders for items now on our books during a period of six months beginning October 1, 1954 and ending March 31, 1955, in accordance with

paragraph 2b of our several agreements, namely, 30% of the commission rate provided for on the original orders for such items."

The material facts are not in dispute. The only question is one of law. The contract governing the parties' rights is clear and brief. Plaintiff was to receive commissions on net sales, the commission "to continue on all re-orders for the same item." There was only one condition, namely, if plaintiff were unable to service adequately an account "whether for business or personal reasons" defendant was to continue to pay commissions for a period not to exceed five years at the rate of 30% of the stated commissions. The letters constituted the contract—and the only contract between the parties.

The contract is as revealing in what it does not contain as it is clear in stating the agreement of the parties. There is no restriction upon termination against setting up a competing business. The plaintiff was free to cease servicing the defendant's accounts at any time for business or personal reasons. However, after such servicing was terminated no matter what the reason, whether by death, by plaintiff's election, or by his inability to render adequate service, plaintiff's rights were expressly limited to receiving 30% of the commissions payable to him on his accounts for a period not to exceed five years. The effect of the judgment below is to create a new contract for the parties to which the defendant never consented and to which probably never would have consented had the terms been suggested.

Plaintiff received notification that defendant desired to terminate its relationship with him in the Spring of 1954 after he had informed defendant that "I could no longer continue my relationship on a new basis for new business with Atlantic Plastics." He then "decided to open up [his] own molding plant" (20a).

Obviously, defendant could not have as its "sales representative" a man owning a competing business who would continue to have access to its prices and possibly manufacturing techniques and costs. As a manufacturer, instead of a sales representative, by the absorption of some or all of the sales commissions plaintiff could underquote on every order. In the plastic molding business changes, modifications and variations of items are continuous. It would have been grossly unfair to have defendant saddled with a sales representative who could, by modification or slight change of an item, contend that it was a new item and not a reorder of an old item. Plaintiff, having entree into the plants of defendant's customers, could easily suggest variations and new items for which he would endeavor to receive the orders. He readily admitted as much (30a).

It is no answer to say that under the commissions agreement plaintiff could have taken and did take orders to another manufacturer. Defendant knew that the agency was not exclusive when it engaged his services and consented to the non-exclusive arrangement only upon plaintiff's assurance that it was his firm and invariable policy never to play "two sources against each other on the same equipment" (39a). Merely because defendant was willing to make a contract under such circumstances is no evidence that it would have been willing to have made the same contract had plaintiff then been a manufacturing competitor. As a manufacturers' agent representing several principals, it would be to the plaintiff's best interest to place an account with that principal who was most capable of satisfying the needs of the particular customer. On the other hand, in his dual status as agent and competitor, it would have been to his best interest to have seized as many accounts as he could have obtained regardless of whether his principal could supply them.

Although the existence of an exclusive agency contract would necessarily preclude competition by a manufacturers' agent, it does not follow from the absence of an exclusive contract that the agent himself may compete. There is no express provision allowing the agent to compete with his principal, and if plain-

tiff is to prevail, it would be only on the theory that such a provision must by necessary implication be read into the contract. The law, however, is exactly to the contrary. The soundness of the rule as set forth in the Restatement of Agency, section 393, cannot be seriously questioned:

> "Unless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency."

■ Even without a contract, equity might well have denied to plaintiff the privilege of invading, or walking off with, the accounts which he had been handling. The relationship between a manufacturer and a manufacturers' sales representative is and should be close. Legal principles relating to "arm's length" transactions do not apply. The business standards applicable to parties in a fiduciary relationship have not been better stated than by the late Justice Cardozo (then Chief Judge of the New York Court of Appeals) when he wrote in Meinhard v. Salmon, 1928, 249 N.Y. 458, 464, 164 N.E. 545, 546, 62 A.L.R. 1:

> "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. Wendt v. Fischer, 243 N.Y. 439, 444, 154 N.E. 303. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd."

A situation very similar to the case now before the court was presented to the Supreme Court of Alabama in W. H. Kirkland Co. v. King, 1947, 248 Ala. 643, 29 So.2d 141, 143. The court there held that the acquisition by the sales representative of a substantial interest in a competitor justified termination of the contract, relying on the following quotation:

> "Manifestly, when a servant becomes engaged in a business which necessarily renders him a competitor and rival of his master, no matter how much or how little time and attention he devotes to it, he has an interest against his duty. It would be monstrous to hold that the master is bound to retain the servant in his employment after he has thus voluntarily put himself in an attitude hostile to his master's interests." (29 So.2d 143.)

■ When plaintiff went into the manufacturing business he had "an interest against his duty." Nor can he complain since he "voluntarily put himself in an attitude hostile to his master's interest."

■ Despite plaintiff's conduct, under the contract defendant could not cut off his commissions. To be sure he no longer was in a position to service the accounts but the contract provided that commissions would continue even in the event of death. Therefore, the judgment should be modified to provide for the payment to plaintiff of 30% of the commissions to which he would have been entitled on the accounts then being handled by him for a period not to exceed five years from the date on which he became a manufacturing competitor. This is all that plaintiff bargained for or could rightfully receive. He voluntarily chose to organize and own a competing manufacturing business. He should not have the benefits from both. His new status was inconsistent with the duties required to be performed under his contract.

The judgment should be modified and the case remanded for entry of judgment for the plaintiff in accordance with this opinion.