Millard L. Midonick, S.
This proceeding is brought by petitioning executors under the will of the decedent author, to recover from Simon & Schuster as publishers, certain royalties, earned by the sale of the decedent’s books, in the amount of some $58,000 as at the inception of the suit. The respondent’s motion to dismiss on the ground of lack of jurisdiction in the Surrogate’s Court over the subject matter of a mere contract chose in action, not specific segregated property, was denied, and the respondent’s answer was deemed a motion for summary judgment to dismiss the petition on the merits rather than on the basis of lack of jurisdiction, or to grant the relief requested by petitioners. (Matter of Young, 80 Misc 2d 937.)
The will of the decedent provides that her entire residuary estate is payable to Mt. Ascutney Hospital and Health Center at Windsor, Vermont, operated by the Windsor Hospital Corporation, a public charitable enterprise. Both the eleemosynary beneficiary and the Attorney-General of the State of New York join in the presentation of the petitioners seeking judgment in the full amount owed, or, in the alternative, interest on the sums withheld.
The petitioners urge that the entire net sums earned by the decedent’s books as measured by the contracts, be paid over forthwith and that the contracts be terminated and balances be finally accounted for. The respondent publisher resists such a disposition, relying on the express terms of all four contracts, one for each book, providing that "in no event” shall the amount, payable by the publisher to the author in any one calendar year under each contract, exceed $3,000 in respect to three books, and $4,000 in respect to the fourth. No substantial sum was earned by sales of any but the first of the four books; substantially all of the royalties due by the date of this decision have been earned under that contract alone, although as of March 31, 1974, almost $5,000 was due for another of the four books.
Petitioners concede and "have never contended that Simon & Schuster breached its contract”. Instead petitioners elect, if they have the power to elect, or contend, that "the contract for the payment of royalties and the annual limitation under the July 22, 1963 agreement to publish 'The Town and Dr. Moore’ (under which approximately $50,500 now remains in the hands of the publisher as a credit to the account of the author’s estate) is terminable on the death of the author. * * * Since there is an annual limitation and since there is no *922 definite time limit to the payment of royalties once the book has been published, the contract is indefinite as to its duration and could be perpetual by its terms.”
The royalty contract of July 22, 1963 did not contain any words of survivorship after the author’s death, although the later three agreements involving less successful books did. But neither did the July 22, 1963 contract provide for a change in its payment terms on or after death.
This contention of the petitioners must fail. Plainly, if the successful book were still earning royalties hand-over-fist at and after the author’s death early in 1974, 11 years after the contract date, the executors would stoutly and properly insist upon holding the respondent to its continuing express bargain. If the doctrine of terminability after a reasonable time were to be applied, and petitioners argue that death is such a time, it seems to the court that the expiry of copyright would be far more logical to choose when and if such a choice has to be made by a court. Yet, if authors of works of such durable popularity as Charles Dickens or Mark Twain were involved, contracts of open-ended duration may well be found to survive even the periods of copyright, since the publisher might be even more vulnerable than the defendant in Meinhard v Salmon (249 NY 458). There the 20-year termination date was disregarded because a breach of fiduciary duty was found between joint venturers under an expired agreement. The oral argument on behalf of this publisher conceded such a possibility even after a work would become in the public domain.
Were the contracts terminable on reasonable notice, before, at or after copyright expiration, the parties or a court would still be faced with disposing of postcontract problems fairly: the publisher would be likely to retain the right to sell reasonable stocks of books on hand at wholesale to retailers or to the author’s representatives; if sale were to others than the author, the royalties would be payable; and royalties owing and to be owed would still be payable on the limited annual basis provided in the terminated contracts. Termination is not equivalent to abrogation.
Not having provided for a change at the author’s death, her death seems not to require the termination of the contract, or at least this clause of it. Indeed, it seems that such death must be found to have been within the contemplation of reasonable persons in the positions of the contracting parties, for one reason because the contract speaks of the annual calendar *923 payments "in no event” to exceed $3,000; death is an "event” thus excluded from consideration by language which embraces death. To have expressed certain "events” might have excluded others, so the contracts limited payouts "in no event” to more than $3,000 per year.
Despite the failure of this typewritten contract, covering the author’s most successful book, expressly to provide that it is binding on executors or other successors, it hardly needs citation that an estate is usually bound by the commitments of and restrictions on the rights of its decedent. The executors succeed only to such rights as the decedent had. The parties in no way provided for acceleration in the event of assignment, whether voluntary or by death or other operation of law. On the contrary, this contract, and the others with this author, provide that "in no event” shall the publisher pay over to the author more than a specified sum in any one calendar year. It is settled contract law that "since the assignee’s contractual rights are derivative, it may not receive what its assignor could not.” (Hickey Co. v Imperial Realty Co., 73 Misc 2d 498, 500. Accord: Restatement, Contracts, § 167, subd [1].) "A personal representative * * * acquires only such title as the decedent had”.
Nor is there any basis on which to impress upon this fund a "constructive trust.” "Some fraudulent or unfair and unconscionable conduct is essential to create a constructive trust” (89 CJS, Trusts, p 1022).
To set aside a contract limitation as "unconscionable” it must be found to have been unconscionable "when made” on July 22, 1963. (Uniform Commercial Code, § 2-302.) Upon publication, the publisher assumed a risk of being unable to sell the first printing thereby subjecting itself to loss of advance payment as well as much of the cost of editing, printing, distribution, promotion and selling costs. At time of contracting, date of death was unknown, and success or failure of this book a matter of conjecture. Under these circumstances, the lack of interest payments, despite possible accumulation of royalties in the hands of the publisher, cannot be deemed unconscionable.
The intention of the parties to have no interest is apparent not only from the absence of any express interest undertaking, but also by reason of the annual payout limitations, the conduct of the parties for more than a decade, and the *924 petitioners’ concession in their brief that the respondent "never * * * breached its contract”.
There is no indication that the author was in financial distress at the time of contracting, or could not have contracted for better terms with another publisher. Instead, there appear to have been tax advantages to the author at the time of contracting, in respect to stabilizing the flow of royalties to her over the foreseeable years of her life, and possibly even after her death. No claim is made of any dissatisfaction with the contract on the part of the author for almost 11 years of her life between contract date and death, nor did she attempt, as her executors now attempt, to terminate this or any of the contracts by any notice, whether based on alleged indefiniteness of the term of the agreement or on any other ground.
There is no basis in fact, in law, or in equity for this court now to nullify express contract provisions as to annual payment limitations, which have been observed and relied upon by publisher and decedent for many years, simply because the decedent’s executors have decided in the special circumstance of this particular estate that it no longer suits the purpose of this estate or certain of its beneficiaries to continue to be bound by portions of their contracts. An untenable precedent would arise from an opposite finding in this case, in the event that in the next case two different residuary beneficiaries were involved, one being tax exempt for income as here, and one not, each pressing for an opposite result under the same contract.
No reformation of the contract can be made because of mutual mistake, nor can rescission be entertained because of justifiable mistake on the part of one party and overreaching by the other. There was no mistake of any kind by either party.
The obvious fact that the restrictions on annual income payments appear in the agreements, shows that the parties did contemplate the possibility that the respective books could earn substantial sums in royalties and that payout could extend over a substantial period of time.
Had the decedent insisted before contracting, upon express termination of the contract on death, or complete payout in the event of death, the publisher might have declined to contract, or might have insisted as a condition on protecting itself by life insurance presumably at the author’s expense.
If the publisher had, after contracting, discovered the roy *925 alty rate to have been too high, it would have had no right to terminate or modify, any more than the decedent or her executors have such a right.
The income tax consequences to all authors may be seriously detrimental to them, even while they are alive, if the courts were to construe such contracts as giving rise to trust funds subject to interest on withheld royalties. Even a simple holding by this court that a trust fund has been established may defeat what this author and other authors, bound by similar clauses, and the publishing industry have thought to have been the tax consequences of their agreements, by giving rise to a claim by the Internal Revenue Service that (if State law considers that such liabilities are trust funds), such payout limitations will be ignored for tax purposes, and authors parties to contracts subject to New York law may become currently taxable on accruing royalties notwithstanding the payout limitations in their contracts (see example [3] in rev rule 60-31, as mod by rev rules 64-279 and 70-435, reported at vol 4 CCH 1975 Standard Federal Tax Reporter, par 2834.1467; the facts in that example, on which authors and publishers rely, include that "the publisher shall not be required either to pay interest to the [author on undistributed amounts] or to segregate any such sums in any manner”).
Finally, petitioners seem to urge that a single overpayment advance of $5,000 in February, 1974 shortly after death, despite a payment of $3,000 shortly before death in January, 1974, both in the same calendar year, provides the basis for construing this contract as an ambiguous one, and subject to interpretation by reason of this request and acquiescence of the parties, as conduct meaning that the contract payout limitations do not apply after death. A $5,000 advance on request, though needlessly made, does not achieve the construction petitioners seek. The $5,000 advance does not resemble the $53,452.58 then owed (or shortly to be owed as of March 31, 1974), nor did a pattern of advance payments emerge. A fractional overpayment as a courtesy should not be misinterpreted as an acknowledgment of a total payout duty expressly contrary to a plain limitation in the contract. A total payout may have had the effect of an intentional waiver, or of conduct construing the contract so to apply, or even of an estoppel to recover such a sum if a change of position by the payee had occurred in reliance.
For the reasons set forth, and because neither party to the *926 agreement, nor the intervenors, demonstrate or even assert that there are any triable issues of fact, summary judgment is hereby awarded by dismissing the petition in its entirety on the merits. This dismissal is of course without prejudice to the petitioners’ and the beneficiary’s rights under the contracts to continue to become entitled to annual payouts as provided by the contracts. It is also open to the parties, if so inclined and so advised, to compromise their respective rights by settling for a lump sum, subject to the approval of this court.