■ RICHARD A. BERNSTEIN, Appellant-Respondent, v JACK K. COOKE et al., Respondents-Appellants, and MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Respondent, et al., Defendant. — Order and judgment of the Supreme Court, New York County (Arnold G. Fraiman, J.), entered on March 8, 1983, which, *inter alia,* granted plaintiff's motion at the end of trial to amend his complaint and to conform the pleadings to the proof to assert a claim for work, labor and services based in *quantum meruit* and awarded plaintiff $35,000, is affirmed, without costs or disbursements. ¶ An examination of the record indicates that at the conclusion of the trial, the court suggested that plaintiff move to conform the pleadings to the proof so as to assert a *quantum meruit* claim for services rendered. The $35,000 amount awarded to plaintiff in that regard was accepted by the parties involved. It is not the responsibility of this court to set aside a valid stipulation merely because the agreed-upon sum of money may not appear to be fair. Concur — Carro, J. P., Bloom, Milonas and Alexander, JJ.

Asch, J., dissents in a memorandum as follows: This dispute arises out of the August, 1979 sale of the Chrysler Building, as well as related property, to the solely owned corporations of Jack Kent Cooke. Cooke's interest in purchasing the property arose from his desire to effectuate a nontaxable exchange of real estate. ¶ According to plaintiff Bernstein's February, 1983 trial testimony, in pursuit of real estate Cooke might purchase, Cooke's California attorney had sought out Bernstein, who was involved in the real estate business and had a personal net worth of between 10 and 20 million dollars. At Cooke's request, Bernstein flew out to California on June 20, 1979, and held a lengthy discussion as to their personal financial situations and to real estate which might be available. Bernstein testified that he told Cooke that he was not broker, finder, salesman or promoter, but analyzed and negotiated acquisitions only in instances where he had an equity interest. As to parcels of real estate, Bernstein assisted Cooke in narrowing his attention to three potential properties, all in New York State, including the Chrysler Building in Manhattan. Bernstein suggested that upon Cooke supplying the necessary cash financing, Bernstein would receive a 25% interest and Cooke a 75% interest. Assertedly, however, Cooke was willing to give Bernstein only a 15% equity interest and, if lawyers could arrange a different, lesser share of tax benefits, only a 5% interest to Bernstein in the tax benefits. Bernstein testified that he and Cooke shook hands on this deal. Bernstein then returned to New York to pursue the acquisition of the Chrysler Building. Cooke, himself, came to New York on July 5, 1979, and stayed at the Waldorf Astoria, where, according to Bernstein and his wife, Cooke told them in looking out the window and pointing to the property, "We are partners." ¶ Edward Kulik, senior vice-president of the Major Properties Division of Massachusetts Mutual, arranged a breakfast meeting with Cooke and Bernstein. He was satisfied with Bernstein's knowledge of the property and of the real estate business. At that meeting, Kulik received a list of key people involved in the proposed transaction (including attorneys with addresses and phone numbers, etc.), drawn up by Bernstein at Cooke's request, and listed thereon as purchasers were Cooke and Bernstein. Massachusetts Mutual thereupon delivered massive amounts of papers concerning the finances and ongoing renovation construction of the Chrysler Building to Bernstein's office. Cooke's financial assistant, James Lacher, who had little real estate experience, joined Bernstein and his staff in New York for review of these papers. On July 17, 1979, Bernstein and Lacher met with the

lawyers selected by Cooke and Bernstein to act as purchasers' attorney, and among other things, Bernstein discussed memorialization of the Cooke-Bernstein partnership in terms of 85-15% equity shares and 95-5% tax benefit division. Meanwhile, however, Kulik had returned to Massachusetts Mutual's offices and had there learned for the first time of Bernstein's participation in a substantial deal involving Massachusetts Mutual which entailed a reorganization filing. He telephoned Bernstein and indicated that he would recommend against Massachusetts Mutual approving a sale of the Chrysler Building to any entity in which Bernstein was a partner or associated as managing agent, due to the prior bad lending experience with him. Kulik telephoned Bernstein the next day, July 18, to tell him his decision was final. According to Bernstein, he then called Cooke and advised Cooke of what had happened. He stated that Cooke responded that no one would dictate who his partners should be and that they should continue working on the deal. Later the same day, it is undisputed that Cooke telephoned Kulik and the conversation ended with Cooke promising Kulik that Bernstein was out. According to Bernstein, it was not until July 24, 1979, one week later, that Cooke advised him that Cooke was concluding the acquisition himself, purportedly on the ground that the partnership with Bernstein was unenforceable as it was not in writing, and promising that Bernstein would be compensated by him. In the intervening week, Bernstein had worked 18 hours a day on analysis and projection of the Chrysler Building transaction. Bernstein warned Cooke that he was not working for a salary, but was prepared to sell his interest in the partnership. Cooke refused to discuss any such arrangement and proceeded to pursue the sale/exchange on his own. ¶ This was the evidence supporting Bernstein's claims of partnership and fraud, seeking a 15% interest in the Chrysler Building or, alternatively, in excess of $13,000,000 damages. ¶ After summations, the court rendered an oral decision. It found that plaintiff had initially approached Cooke and that no actual agreement was entered into between them as to how Bernstein would be compensated for his services in connection with the acquisition of the property even though plaintiff had expressed his desire for a minor equity interest therein as well as the managing agent contract. Alternatively, the court found that even if there were a partnership agreement between Cooke and Bernstein, it was contingent upon acquisition of the real property and that the agreement "failed here of inability" when the seller Massachusetts Mutual refused to consider any transaction if Bernstein played any role in the ownership or management of the property. ¶ In spite of these findings, the trial court clearly was of the opinion that Bernstein was entitled to some compensation for his part in bringing about the sale of the Chrysler Building to Cooke. Accordingly, it strongly urged that the attorney for plaintiff make an application to be permitted to assert a claim in *quantum meruit*. ¶ "Now, that leaves open a claim, based on quantum meruit, which the Court believes that Mr. Bernstein is entitled to make against Mr. Cooke, in connection with the value of the services which he performed between June 20th and July 24th, of 1979. ¶ "However, the complaint does not contain a cause of action for quantum meruit. ¶ "Mr. Haydon, if you would like, without prejudice to your position that there was a partnership agreement, an enforceable partnership agreement between the parties, to conform the pleadings to the proof at this time, and assert a cause of action for quantum meruit, I will entertain that application." ¶ Neither party was very receptive to this suggestion. The attorney for Cooke obviously felt that once the court had decided in his favor that he not be subject to a claim for compensation by Bernstein. At very least, he argued that he had lost the opportunity to produce witnesses to support his position. In response to the misgivings of Bernstein's attorney, the

court stated: "THE COURT: Well, Mr. Gould, I could perfectly understand Mr. Haydon's reluctance to assert a cause of action for quantum meruit when he's alleging a cause of action based upon a partnership agreement. Strategically, it does not place him in a very favorable position, if he is arguing in the alternative that, well, if he didn't have a partnership here, we have a quantum meruit case." In the end, both parties acquiesced, subject to expressed reservation of their rights on appeal. ¶ From the inception of this action through this appeal, one of the difficulties has resulted from the inability to translate the underlying facts of this case into legal categories which will lead to a just result. The Trial Judge questioned whether the parties had entered into an express contract. But he might well have found that the parties had embarked upon a coventure. Certainly, a question persists as to why independently wealthy Bernstein would work day and night on the Chrysler Building deal if he did not have some arrangement for substantial participation by him. ¶ Cooke's statement to Bernstein that they would go on together in the venture, even after he heard from Kulik, extended their relationship. It was Cooke's obligation at that time to make an effort in their joint behalf. Perhaps it would have done them, or Bernstein, no good, but as Bernstein's coventurer, who encouraged Bernstein to keep working, he had a trustee's obligation not to betray Bernstein. ¶ Both parties were multimillionaires. Concededly, Cooke was not too experienced in the real estate field and depended upon Bernstein to find the deal and to shepherd him through the transaction. It seems incredible, considering their commercial experience and the nature of their dealings with each other, that either party would consider a flat amount of 35 thousand dollars, in a real estate sale of 87 million dollars, as adequate compensation. Even if Cooke and Bernstein did not enter into a formal partnership agreement, which is what the Trial Judge found, the facts establish that they clearly were coventurers. Certainly, Bernstein was entitled to look to Cooke to protect his stake in the deal, to wit, compensation based upon a continuing relationship and appropriate to a transaction of this magnitude. *Meinhard v Salmon* (249 NY 458, 465), is directly in point: ¶ "The trouble about his conduct is that he excluded his coadventurer from any chance to compete, from any chance to enjoy the opportunity for benefit that had come to him alone by virtue of his agency. This chance, if nothing more, he was under a duty to concede. The price of its denial is an extension of the trust at the option and for the benefit of the one whom he excluded. ¶ "No answer is it to say that the chance would have been of little value even if seasonably offered. Such a calculus of probabilities is beyond the science of the chancery. Salmon, the real estate operator, might have been preferred to Meinhard, the woolen merchant. On the other hand, Meinhard might have offered better terms, or reinforced his offer by alliance with the wealth of others. Perhaps he might even have persuaded the lessor to renew the Bristol lease alone, postponing for a time, in return for higher rentals, the improvement of adjoining lots. We know that even under the lease as made the time for the enlargement of the building was delayed for seven years. All these opportunities were cut away from him through another's intervention." ¶ The trial court sought to interpret Bernstein's options, when Cooke encouraged him to go on, as being limited to an illegal and fraudulent secret understanding. But that was not the only possibility. ¶ One of the possibilities is that Bernstein would have nothing to do with the running of the building; another is that the parties could have visited Massachusetts Mutual together and sought to work it out. There are incalculable possibilities and as Chief Judge Cardozo said in *Meinhard (supra*, p 465): "Such a calculus of probabilities is beyond the science of the chancery." ¶ Nor did Cooke's obligation end there. He continued his relationship with Bernstein by inducing appellant to keep working, which was Bernstein's contribution to

the partnership. Cooke could no longer take the benefit of Bernstein's work and then repudiate their agreement. ¶ Even where one may rescind a contract for fraud, he cannot have it both ways. "One elects either to continue with the contract fraudulently induced or to rescind it. If one elects to continue with it, one accepts all the burdens contained in the contract as well as the benefits" (*Soviero Bros. Contr. Corp. v City of New York,* 286 App Div 435, 442 [per Breitel, J.], affd 2 NY2d 924). ¶ The duty of a coventurer is that of the "finest loyalty" (*Meinhard v Salmon, supra,* pp 463-464). If Cooke took unfair advantage of his relationship with Bernstein, if he has been unjustly enriched through the expenditure of time, effort and expertise of Bernstein for his benefit, the law is flexible enough to fashion a suitable remedy (see 50 NY Jur, Restitution and Implied Contracts, § 1 *et seq.*). ¶ While the plaintiff sought to establish an express contract, at very least the allegations of the complaint, as well as the proof at trial, were more than sufficient to justify a claim on the theory of unjust enrichment. ¶ Fairness to the parties dictates that the matter be referred back to the trier of fact for a determination as to the precise nature of the relationship of the parties, the benefit conferred upon Cooke, the value of Bernstein's services and as to the remedy appropriate under the circumstances.