A. G. Messick et al., Appellants, v. Brokaw and Company et al., Appellees.
Brokaw and Company, Cross Appellee, v. A. G. Messick et al., Cross Appellants.

**Gen. No. 41,486.**

128

Opinion filed April 23, 1941.

TENNEY, HARDING, SHERMAN & ROGERS, of Chicago, for appellants; S. ASHLEY GUTHRIE and WILLIAM W. MILLER, both of Chicago, of counsel.

ALBERT H. & HENRY VEEDER, of Chicago, for appellees; ALBERT H. VEEDER, of counsel.

MR. JUSTICE BURKE delivered the opinion of the court.

On July 7, 1933, Allen G. Messick and W. C. Perkins filed their bill of complaint in the superior court of Cook county against Brokaw and Company, a corporation, J. Russell Forgan, Charles C. Cushing, John Clark, Woodruff J. Rankin, Arch E. Richards, Frank Donnelly, and Hortense M. Swift, Charles H. Swift, T. Philip Swift and Edward F. Swift, Jr., executors of the will of Edward F. Swift, deceased. The suit is based on Brokaw and Company's liability to account for its transactions as manager of a pool or syndicate, in which Messick, Perkins and Brokaw and Company were equally interested, the purpose of which was to trade in the stock of the United States Radio & Television Corporation. Brokaw and Company filed a cross bill claiming Messick and Perkins were indebted to the syndicate on a certain note of the Robbins Body Corporation, held in the syndicate account and bearing their endorsement. The case was tried before a master, who filed a report recommending that the bill be dismissed and that the cause be re-referred to the master for an accounting on Brokaw and Company's cross bill. Exceptions filed to the report were overruled and a decree entered physically embodying all

the master's findings and conclusions, and ordering, in accordance with the master's recommendations, that the bill be dismissed and an accounting had on the cross bill. Without objection, J. Russell Forgan, John Clark, Woodruff J. Rankin and Arch E. Richards were dismissed as defendants. During the pendency of the suit, W. C. Perkins died and Justina C. Perkins, administratrix of his estate, was substituted for him as plaintiff in the bill of complaint, but not as defendant to cross bill. The liability of the executors of the estate of Edward F. Swift, deceased, is predicated on the fact that the assets of Brokaw & Company amounting to $595,000, which were distributed to Edward F. Swift, the then sole stockholder, in the form of liquidating dividends without making provision for payment of the amount due plaintiffs and rendering Brokaw & Company insolvent to an amount in excess of the dividends paid. The parties agreed that if Brokaw & Company is liable the Swift estate is also liable to the extent of the dividends received. Plaintiffs also claim that the Swift estate is liable for interest on such dividends. Frank Donnelly, president and director of Brokaw & Company, was made a defendant because he was on the board of directors that declared the liquidating dividends. Plaintiffs assert that he is liable under the statute. Plaintiffs prosecute this appeal and ask that the decree be reversed and that the cause be remanded with directions to enter a decree sustaining plaintiffs' exceptions to the master's report, ordering an accounting as prayed in the plaintiffs' amended bill and fixing the scope and basis of the accounting, and dismissing the cross bill. For convenience, we will speak of Messick and Perkins, the original plaintiffs, as "plaintiffs" and Brokaw & Company as "defendant."

Brokaw and Company, regarded as the principal defendant, is an Illinois corporation, located in Chicago, engaged in the business of buying and selling

securities during 1928, 1929 and 1930. It was not a brokerage firm and was not a member of the stock exchange. Messick and Perkins were mature, experienced and successful businessmen, who for many years had carried on large scale business operations. Messick graduated from the law department of the University of Indiana in 1912. He coached football during the first year he was out of school and from the latter part of 1912 until 1928 engaged in the general practice of law in Marion, Indiana. Thereafter, he was engaged in the banking and manufacturing business, but continued with his law practice. He was successively associated with the Superior Body Corporation, The Gas and Electric Corporation, Grant County Gravel and Sand Company, Hogan McKinney & Company and The Commercial Belting Company. He was also president of the Robbins Body Corporation of Indianapolis, Indiana, and a director of the Spencer Cardinal Corporation of Marion, Indiana. At the time he testified he was 46 years of age and was chairman of the executive committee of the General Household Utilities Company, a corporation engaged in the manufacture of radios and refrigerators. W. C. Perkins was president of Radio Allied Corporation of Indianapolis in the early part of 1928. This corporation bought radio chassis from the Case Electric Company. At the time Perkins testified on December 17, 1936, he was ill and had not been engaged in any business since the preceding April. At the time he became ill he was first vice president of the Case Electric Company, with a factory at Marion, Indiana and with his office in Chicago. Plaintiffs, at the time of the transactions discussed in this case, were competent and able business executives and were men of substantial means. The subject matter involved in the pool or syndicate pertains to shares of common capital stock of the United States Radio & Television Corporation, a Delaware corporation, organized in

1928, by the acquisition of assets of certain other companies in which Messick and Perkins were interested. For convenience, we will speak of the United States Radio and Television Corporation as the "U. S. Corp." The corporation was organized by plaintiffs. Perkins became president and a director and Messick became chairman of the board of directors. They were also substantial stockholders. The certificate of incorporation was issued November 30, 1928, and provided for the issuance of 125,000 shares of common stock at no par value. An amendment dated April 26, 1929, authorized an increase of the capital stock to 250,000 shares without par value. During the active transactions of the pool only 125,000 shares of capital stock without par value were authorized. The evidence does not show how many of these shares were issued and outstanding between January 1, and April 26, 1929. Plaintiffs requested defendant to finance the corporation by underwriting 62,500 shares of the common capital stock at $17.50 per share. Accordingly in December, 1928, defendant purchased 62,500 shares of the stock at $17.50 per share and paid therefor in cash. 44,643 shares were purchased from the U. S. Corp., and 17,857 shares were purchased from plaintiffs. Defendant paid the corporation $781,252.50 for said stock and paid the plaintiffs $312,497.50 for their stock. On December 29, 1928, defendant sold back to Messick 6,459 shares at $20 a share; on December 29, 1928 sold back to Perkins, 6,458 shares at $20 a share; on January 10, 1929, sold back to Messick 91 shares at $20 a share, and 600 shares at $24.50 a share, being a total of 13,608 shares sold back to plaintiffs. During this period defendant also sold shares to certain customers at prices considerably higher than prices at which the stock was sold to plaintiffs, in some cases such prices being as high as $71 per share. No sales were made at lower prices than to plaintiffs during that period. On January 18, 1929, 7,601 shares of

the underwritten stock was still in the hands of defendant and had not been sold. All of the rest of the stock had been sold by defendant to its customers. Defendant had no fixed or permanent interest in the U. S. Corp. The only concern or connection defendant had with such corporation was as distributor in the normal course of its business of the underwritten shares and as a participant in the pool. At all times in question defendant was the owner of a substantial amount of stock in the U. S. Corp. Charles C. Cushing was president, director and a stockholder of defendant during the period of the transactions of the pool. He was the officer who represented and acted for the defendant in nearly all of the transactions in question. He ceased to be president on January 18, 1931. He was not served and did not appear. It does not appear that any effort was made to take his testimony, or whether his whereabouts was known. Frank Donnelly subsequently became president of defendant and at the time of the filing of the master's report was still president. He has been a director of defendant since January 18, 1931. After the purchase of the 62,500 shares by defendant the parties discussed the matter of the formation of a pool or syndicate to deal in such common stock, and on January 18, 1929, the following memorandum of agreement was entered into by and between plaintiffs and defendant:

"January 18, 1929.

"Messrs. W. C. Perkins and A. G. Messick,
1340 South Michigan Ave.,
Chicago, Illinois.

"Gentlemen:

"The following is my understanding of agreement we have in connection with the United States Radio & Television Corporation pool:

"1. The pool has a 60 day call on approximately 10,000 shares of stock at $60.00 per share.

"2. The pool has a call on 10,000 shares of stock to be contributed jointly by Messrs. Perkins and Messick at $60. per share.

"3. If the pool exercises the option on Messrs. Perkins and Messick's stock, the pool will immediately reimburse them an additional $10 per share for their work in helping organize the pool.

"4. The pool account is divided as follows:

One third—W. C. Perkins,

One third—A. G. Messick,

One third—Brokaw and Company.

"5. The pool will run for a period of six months from date with an option by the managers for the privilege of extending for another six months and with the further privilege of closing at any time at the discretion of the managers.

"6. Brokaw and Company shall act as sole managers of the pool, with power to act in their sole discretion in buying, selling or in any manner or method dealing in said shares of stock, and to borrow funds thereon and to pledge said shares for security therefor, without liability except for breach of good faith.

"Sincerely yours,

Brokaw and Company,

By Charles G. Cushing, Pres.

"Approved:

A. G. Messick

W. C. Perkins."

At the time the above agreement was signed defendant had realized a profit of $209,786.25, plus 7,801 shares which it retained. During the period in question defendant also managed three other pools. The pool was very active until June 18, 1929. Thereafter,

the activity was not so great. For all practical purposes the pool was closed with the completion of certain transactions in September, 1930. Dealings by defendant in the shares of the U. S. Corp. appear in six ledger accounts received in evidence as plaintiffs' exhibits. We hold that the relationship of plaintiffs and defendant with respect to the pool was that of joint adventurers, and that as manager of the pool defendant's relationship to plaintiffs was the same as that of a trustee to its *cestuis qui trustent.* In that respect we disagree with the master and the chancellor. Plaintiffs lean heavily on the case of *Meinhard v. Salmon,* 249 N. Y. 458, 164 N. E. 545. The statements of law announced in that case are sound, but we do not agree that they are applicable to the facts of this case. We are in agreement with the statement by plaintiffs that the burden is on defendants to account to plaintiffs and to show that the items of credit and debit in the account are proper, and that the burden is not upon the plaintiffs to show their impropriety. Here also we disagree with the master. We shall now consider the propositions in dispute in the order in which they are presented in the master's report.

Plaintiffs contend that there is a balance in the pool account of $6,125.43. This item is admitted by defendant. Plaintiffs then maintain that there are twelve instances of wrongful purchases by defendant from the pool. Defendant introduced a letter dated June 17, 1929, which it contends ratified all accounts and transactions up to that time. Nine of the twelve instances of asserted wrongful purchases by defendant antedate the alleged ratification of June 17, 1929. Two of the items are purchases by defendant in the month of September, 1930, and the other item was a purchase from the pool by defendant of 275 shares on June 17, 1929. The letter of June 17, 1929, which defendant contends constitutes a ratification of the transactions

to that date, is signed by plaintiffs and addressed to Charles G. Cushing as president of defendant, and reads:

"June 17, 1929.

*"Mr. Charles G. Cushing, President,*
*Brokaw & Company,*
*Chicago, Illinois.*

"DEAR SIR:

"Referring to our pooling agreement on United States Radio and Television Corporation stock, dated January 18, 1929, we hereby agree that said agreement shall continue for a period of eighteen (18) months from date, and in consideration of your agreement to secure a loan for the Corporation, we hereby ~~assign to you as security for said loan, all of our interest in said pooling agreement from the date thereof up to and including the termination thereof, and~~ give you an option on all of the stock of the corporation at present held in the pool for a period of eighteen (18) months, at Thirty Dollars ($30.00) a share, and you shall have the additional right to re-allocate any part of this option to the Corporation, to individuals now or hereafter connected therewith, or to outsiders, at any time hereafter, at Thirty Dollars ($30.00) a share or the market for said stock at the time of any re-allocation, whichever is lower.

"We also ratify and confirm all your accounts and proceedings as sole managers of the pool to the date hereof, and in addition to the powers granted to you as sole managers in the original pooling agreement, we hereby authorize you to invest the proceeds of the pool in any securities whatsoever in your sole discretion, including advances, secured or unsecured, to the Corporation.

"W. C. Perkins,
A. G. Messick."

The master found that this communication required
no consideration and that it completely confirmed and
ratified all prior acts of defendant with respect to
the pool up to that date, and that plaintiffs are limited
in their right to an accounting, if any, for the period
subsequent to that date. Plaintiffs urge that the letter
of June 17, 1929, did not operate as a ratification of
defendant's prior breaches of trust, or discharge it
from liability therefor. They argue that a purported
ratification from a beneficiary to a fiduciary is not ef-
fective without proof by the fiduciary that the bene-
ficiary was informed or knew of the transactions
claimed to have been ratified and of his legal rights.
The evidence shows that plaintiffs visited defendant's
office almost daily. They conferred as to the opera-
tions of the pool and talked about the accounts. Plain-
tiffs were mature and experienced businessmen, one
of them being a lawyer. They knew their rights. They
organized and were the dominating force in the
operation of the U. S. Corp. in whose stocks the pool
was operating. The books were at all times available
to plaintiffs. All the transactions were recorded in
the books. The defendant was managing the pool.
In addition, defendant was interested in trading in
the stock on its own account. Plaintiffs also owned a
large number of shares and were trading in the stock.
Defendant, as the underwriter of the stock, paid $17.50
a share and plaintiffs repurchased a substantial num-
ber of shares from defendant for $20 a share. Under
the operations of the plaintiffs and the defendant, the
market value of the stock was ballooned until on
February 4, 1929, it reached $141 a share. We adopt
the finding that the letter of June 17, 1929, is a valid
and effective ratification by plaintiffs of all the acts
and transactions had in the pool operations up to that
date. We find that the defendants sustained the
burden of proving that at the time of the ratification
the plaintiffs knew of the transactions claimed to have

been ratified and of their legal rights. Plaintiffs also insist that the letter of June 17, 1929, is ineffective as a ratification because of the failure of defendant to perform the promise which was the inducement and consideration for its execution. It is well established that a ratification may be effective without a consideration. In fact, as a general rule, ratifications are not accompanied by a consideration. We agree with the plaintiffs that if a ratification or release is given for a consideration and the consideration fails, the claimant may treat the ratification or release as rescinded. In the instant case, however, we are satisfied that the ratification was not induced by the promise to secure a loan of $300,000 for the U. S. Corp.

As above stated, plaintiffs contend that there are twelve instances of wrongful purchases by defendant from the pool. Nine of these items antedate the ratification of June 17, 1929, and have been considered in our discussion as to the validity of the ratification. One of these twelve items was the purchase by defendant on July 18, 1929, of 275 shares from the pool at $3,224.68 under the market price, for which plaintiffs ask an accounting. The two remaining items of. this group were purchases by defendant in the month of September, 1930. On May 23, 1930, plaintiffs wrote defendant the following letter:

"Gentlemen:

"The United States Radio & Television Corporation Capital Stock Trading Account #2, in which the undersigned have each one-third interest, the other third belonging to yourselves, granted an option to Brokaw and Company on 11,500 shares of United States Radio & Television Corporation stock at $10 per share, good up to and including October 1st, 1930.

"The undersigned request that you now exercise that option for the following reasons:

"(1)   The Radio Allied Industries of Indianapolis, who have been manufacturing cabinets for the United States Radio & Television Corporation, are now in the hands of receivers.  We propose to loan the proceeds from the sale of the aforementioned stock to this company or to a new company to be formed to take over the assets of this company in order to again continue the business.

"(2)   We believe that the Radio Allied Industries has proved in the past and would prove in the future to be a distinct asset to the United States Radio & Television Corporation as one of their chief suppliers of cabinets.  Our interest, therefore, is to see to it that this source of supply is not lost to the United States Radio & Television Corporation.

"We suggest that you consider this matter carefully in the light of the foregoing facts and let us have your reply within ten (10) days, as it is of utmost importance that the money be paid in at once, if we are to effect our plans."

The option referred to in the letter was not taken up within ten days, nor was the money loaned to the Radio Allied Industries.  Messick testified that the letter was drafted by defendant and submitted to plaintiffs for their signatures.  Defendant undertook to exercise the option mentioned in the letter of May 23, 1930, by the purchase of 4,500 shares on September 3, 1930, and of 5,415 shares on September 11, 1930, at $10.00 per share.  The purchase of 4,500 shares on September 3, 1930, was reported by defendant in a letter addressed to Perkins on September 3, 1930, and in a similar letter addressed to Messick dated September 4, 1930, reading:

"Dear Sir:

"Referring to the option granted to Brokaw and Company, expiring on October 1, 1930, confirmed in

letter dated May 23, 1930, signed by Mr. A. G. Messick and yourself, covering the total amount of United States Radio & Television Corporation Common Stock held by the United States Radio & Television Corporation Common Stock Trading Account No. 2.

"We are exercising our privilege of buying from the Trading Account four thousand five hundred (4,500) shares of the above stock at the option price of ten dollars ($10.00) per share.

"We have credited today to the Trading Account No. 2, forty five thousand dollars ($45,000.00) in payment for the above mentioned stock and enclose check to your order for fifteen thousand dollars ($15,000.00), representing your share of this amount on your one-third interest in the Trading Account No. 2.

"Please sign and return to us copy of this letter enclosed, which will serve as an acknowledgment for letter and check.

"Yours very truly,"

These letters were promptly acknowledged and the checks mentioned in them were cashed by plaintiffs without any comment or question. On September 11, 1930, defendant purchased the remaining shares of the syndicate amounting to 5,415 shares. This purchase was reported by defendant in separate letters to Messick and Perkins dated September 15 and 16, 1930, respectively. Each letter reads:

"Dear Sir:

"Under our option, we have purchased from the Trading Account No. 2, five thousand four hundred fifteen (5,415) shares of United States Radio & Television Corporation Common Stock at the option price of ten dollars ($10.00) per share. This leaves a credit balance in the account of two hundred twenty five thousand one hundred fifty two dollars and thirty four cents ($225,152.34) and after deducting the Robbins Body note amounting to one hundred forty nine thou-

sand three hundred forty dollars and ninety six cents ($149,340.96) there remains a credit balance of seventy five thousand eight hundred eleven dollars and thirty eight cents ($75,811.38).

"We are declaring a liquidated dividend of seventy two thousand dollars ($72,000.00) from the Trading Account No. 2 leaving an undistributed balance of three thousand eight hundred eleven dollars and thirty eight cents ($3,811.38). We enclose check to your order for twenty four thousand dollars ($24,000.00) representing your share of the dividend on your one third interest in this account.

"Kindly acknowledge receipt of this check and letter by signing and returning to us copy of letter enclosed."

These letters were promptly acknowledged and the checks mentioned therein were likewise promptly cashed by plaintiffs without any comment or question. The only testimony with reference to the option is that of Messick, who stated that the entire arrangement concerning the option was made at a conference between plaintiffs and Cushing at the Attic Club in Chicago in September, 1929. Messick stated that in the conversation at the Attic Club, Cushing stated that an acquaintance of his was returning from Europe, who was a distributor of stock, and that Cushing wanted to make a deal with this man to distribute the syndicate stock; that Cushing refused to divulge the man's name; that Cushing stated that in order to distribute the stock it might be necessary to give calls or options to this man as low as $10 per share; that as the stock was distributed they were to give options from time to time to assure him a satisfactory profit and that the syndicate would receive the profits in excess of $10 per share as the stock was marketed, and that Cushing further stated it did not make any difference as to the base price as the members of the syndicate would participate equally in the

profits in any event; that thereupon plaintiffs agreed to let Cushing go ahead with his negotiations for the distribution of the stock. The evidence does not show that defendants turned over any stock purchased at $10 to any distributor to market. The 4,500 shares taken over by defendants on September 3, 1930 at $10 per share were carried in the account known as ''Sales Pool No. 3,'' which was an account in which stock was carried which was distributed by defendant to its individual customers. The remaining 5,415 shares taken over by defendant at $10 per share on September 11, 1930, were carried in the U. S. Corp. capital stock account, in which defendant recorded its individual transactions. The master found that the option to defendant for the purchase of shares from the pool at $10 per share was valid and effective. Plaintiffs assert that the burden was on defendant to show the terms of the option, the method of its procurement, and the right to take stock for its own benefit thereunder, and that the evidence shows that on the exercise of the option defendant was required to market the stock and to account to the syndicate for the profits, which was not done; and that plaintiffs' acquiescence in the exercise of the option would create no estoppel. A careful reading of the testimony and exhibits convinces us that the master was right in his finding as to the validity of the September, 1930 transactions. The terms of the option are set out in the letters. The term for which the option is to run is clearly set forth, the amount of shares is clearly stated and the purchase price under the option is clearly stated, and the parties to the option are definite. In the letter of May 23, 1930, plaintiffs urged defendant to exercise the option in order to obtain cash for their business enterprises. The reading of the letter shows there is no reference to any outside party, nor is there any expectation of obtaining more than $10 per share for the stock. Furthermore, we

are of the opinion that plaintiffs are estopped by accepting benefits arising from the exercise of the option. The checks that were forwarded were accepted and promptly cashed by plaintiffs. It is inconceivable that plaintiffs would accept and cash the checks without comment if the right of defendant to purchase shares at $10 per share was in doubt. We are of the opinion that the testimony of Messick as to the conversation at the Attic Club should be rejected as unworthy of credence.

Plaintiffs argue that there are eleven instances of wrongful sales by defendant to the pool. Six of these items antedate the ratification of June 17, 1929, and are covered by our views as to the ratification. The other five items consist of the sale by defendant to the syndicate on June 18, 1929, of 625 shares for $45,464.64. The market value on the date of sale was $19,375. In September, 1930, these shares were among those sold to defendant at $10 per share. Plaintiffs claim the difference between the price at which they were taken over by the defendant in September, 1930 and the market price of $39,214.64. Plaintiffs also complain of a sale of syndicate stock of 500 shares at $10 per share on May 20, 1930 to J. Clark Coit, when the market price was $16.50 per share, and of the sale of 1,000 shares of syndicate stock to J. O. McKinsey at $10 per share on September 4, 1930, when the market price was $23.75 per share, the loss to the syndicate on these two transactions being $17,000. Plaintiffs also demand an accounting for miscellaneous expenses which they assert were wrongfully charged to the pool account. Some of these items were expended prior to June 17, 1929. Such items subsequent to June 17, 1929, total $3,969.86. Plaintiffs also urge that defendant is obligated to account for its profits resulting from its trading as an individual, as distinguished from trading as a member of the syndicate in the shares of the U. S. Corp. from January 18,

1929, to September 11, 1930. We find that all of the parties traded in the stock of the U. S. Corp., and that the pooling agreement contemplated that they could so trade. It will be recalled that at the time the pooling agreement was signed, all of the parties, including the defendant, had large blocks of stock. The agreement contained no restriction against the sale of this stock. The subsequent conduct of the parties shows that they all understood that they had a right to and did deal in the stock.

Plaintiffs also urge a claim for an accounting as to commissions collected on transactions in the syndicate account. They contend that the compensation to be received by defendant was fixed in the pool agreement, namely one third, and that the defendant should not be allowed to charge any commissions. Defendant points out that it was maintaining a large office force, clerical help, bookkeepers and an expensive set of books. The testimony shows that commissions were paid to the salesmen for selling the stock. Commissions were charged by defendant from the inception of the pooling agreement. Hence, when the plaintiffs ratified the accounts of the defendant on June 17, 1929, they inferentially ratified the action of defendant in charging the commissions. Plaintiffs also maintain that defendant should pay the pool interest on credit balances in the pool account. They point out that except for a short period at the beginning of the transactions, there was always a credit balance in the account. This balance was kept on deposit in defendant's general corporate bank account and was mingled with its own funds. The pool ledger account kept by the defendant credited interest at 6½ per cent from January 18, 1929 to February 1, 1929, and at the same rate for the monthly period to and including July 31, 1929, or a total of $16,693.80. On August 1, 1929, there was a notation in the account reading "no interest hereafter." There are

reversing entries dated May 29, 1930, which have the effect of removing the interest theretofore credited. From the formation of the syndicate until July 31, 1929, defendant credited the syndicate with interest on its credit balances at the rate of 6½ per cent per annum, compounded monthly. The syndicate was charged 8 per cent on its debit balances, but there was no debit balance after the first three months of the syndicate. The testimony as to the crediting of interest is somewhat confusing, but we are convinced that it preponderates in favor of the plaintiffs. The master found that plaintiffs are not entitled to interest. We disagree with this finding. At the time of the ratification of defendant's accounts on June 17, 1929, the books showed that the syndicate was being credited with interest at the rate of 6½ per cent per annum. We have held that the ratification is valid. It is binding on defendant as well as on the plaintiffs. We are of the opinion that interest should be allowed at the rate of 6½ per cent per annum, compounded monthly. Plaintiffs also argue that they are entitled to an accounting for losses aggregating $69,534.61 from transactions admittedly unaffected by either the defense of ratification or estoppel. Finding No. 60 of the master recites that:

"The proofs would warrant an accounting, (on the transactions had on and subsequent to June 17, 1929), only for a total gross amount of $69,534.61, made up of the following items taken from the preceding paragraphs of this report.

| | | |
|---|---|---|
| "A Admitted cash balance | | $ 6,125.43 |
| "B Sales by pool to Brokaw and Company | | 3,224.68 |
| "C Sales by Brokaw and Company to pool | | 39,214.64 |
| "D Sales by pool to third persons | | 17,000.00 |
| "E Miscellaneous expense items | | 3,969.86 |
| | "Total | $69,534.61" |

Plaintiffs state that the master and the court held that the losses so tabulated were offset by the counterclaim on the Robbins Body Corporation note and gave that as the only reason for not ordering an accounting for those losses. Defendant replies that the master did not find that defendant committed breaches of trust causing the syndicate losses in the total sum of $69,534.61. We agree with the defendant. The master proceeded on the theory that assuming all of plaintiffs' claims for transactions occurring subsequent to the ratification (other than the exercise of the option) were correct, still there is no right to an accounting because plaintiffs are liable to the pool in a greater amount as endorsers of the Robbins Body note. Under the finding of the master, the parties would still have an opportunity to submit evidence in support of their respective contentions as to each of the items included in the total sum of $69,534.61. The better practice would be to have the master definitely pass on all these items. However, no one has been harmed because of the procedure followed.

Defendant's answer to the plaintiffs' complaint includes a denial that defendant owed plaintiffs any sum of money and asserts that plaintiffs are indebted to the pool as endorsers of the Robbins Body Corporation note. On September 29, 1934, defendant filed a cross bill against the plaintiffs, setting forth such liability of plaintiffs upon the Robbins Body Corporation note, and praying for an accounting and a decree requiring plaintiffs to pay into the pool the amount in which they are liable as endorsers upon said note. The master and chancellor found that the defense and the cross bill were true and correct in that there is a greater amount due defendant by the plaintiffs, as endorsers upon the note, than is due the plaintiffs by defendant, assuming that anything at all is due to plaintiffs. The chancellor held that the liability of the plaintiffs, as set forth in the cross bill, was established

in the principal amount of the note, plus interest, and he re-referred the cross bill to the master for further hearing, to ascertain what credits, if any, Messick could establish against his liability as endorser of the note. The note is on a printed form and reads:

"$149,340.96          No. ...... Due ............
          "Indianapolis, Ind.   March 27, 1929.

"*On demand* days after. date, for value received, we and each of us promise to pay to the order of The Fletcher American National Bank of Indianapolis at the Fletcher American National Bank of Indianapolis, Indiana, One hundred forty-nine thousand three hundred forty 96/100 Dollars With interest at the rate of eight per cent per annum after maturity until paid and attorney's fees; without relief from Valuation and Appraisement laws. The drawers and endorsers severally waive presentment for payment, protest, notice of protest and non-payment of this note. Proceeds used to pay Robbins Body notes of Fletcher American National Bank, Indianapolis.

                    "ROBBINS BODY CORPORATION,
                         "By A. G. Messick,
                            "*President.*"

The date, the words "on demand," the amount, the signature, the words "Proceeds used to pay Robbins Body notes of Fletcher American National Bank, Indianapolis" and the words "W. C. Perkins, Chicago," are written in longhand with pen and ink, and the note is endorsed with the signatures of the plaintiffs. The printed words "The Fletcher American National Bank of Indianapolis" are stricken out by means of an ink line and above such name is substituted the words "W. C. Perkins, Chicago," as payee. Messick was president of the Robbins Body Corporation, which corporation was one of the principal sources of supply for radio cabinets for the

U. S. Corp. In March, 1929, the Fletcher American National Bank of Indianapolis held notes of the Robbins Body Corporation in an amount of approximately $150,000, which notes had been guaranteed by Messick and others. On March 27, 1929, the Fletcher American National Bank demanded payment of the amount due from the Robbins Body Corporation, and Messick drew the note in question, payable to that bank on demand and endorsed by plaintiffs, and tendered the note to the bank. The bank refused the same, stating that it did not wish to renew the loan and demanded payment in cash. Perkins thereupon paid the loan in cash. At the same time Messick changed the name of the payee from ''Fletcher American National Bank of Indianapolis'' to ''W. C. Perkins, Chicago,'' and delivered the note to Perkins as evidence of indebtedness of the Robbins Body Corporation. On April 3, 1929, defendant advanced to Perkins the amount which he had paid on the note and thereupon took over the note as evidence of indebtedness. On October 10, 1930, the note being unpaid, defendant transferred the note to the pool account, taking credit for the amount it had paid therefor. The Robbins Body Corporation went into the hands of the Federal court the latter part of 1930 or the first part of 1931. It was dissolved on April 1, 1932, by the State of Delaware for nonpayment of its franchise taxes. In the original answer to the cross bill plaintiffs admitted that they had signed the Robbins Body Corporation note. Testimony on the case was heard before master in chancery Harry Smitz. Following his death the case was then referred to William R. Swissler as a special commissioner. Proofs on the cross bill were commenced before commissioner Swissler on June 6, 1938. Defendant, as cross complainant, introduced a photostatic copy of the note. On July 24, 1939, Messick filed an amended answer to the cross bill. This answer was

verified by Messick on July 20, 1939. In the amended answer Messick stated that he made out the note as set forth in the cross bill, except that the name of the payee was the Fletcher American National Bank of Indianapolis and not W. C. Perkins of Chicago; that Messick ''does not know when the note was altered by changing the name of the payee to W. C. Perkins, or by whom it was altered; that he has never seen the note, signed by him as president of Robbins Body Corporation and endorsed by him and Perkins individually, since March 27, 1929, at which time it was payable to the Fletcher American National Bank of Indianapolis.'' Messick took the witness stand and swore that although the original answer contained his admission to the effect that he signed the note in question, this was first called to his attention at a recent conference at his attorneys' office and that he then discovered for the first time that the note had been altered. He then testified that at the time he filled out the form, signed it and endorsed it, the name ''Fletcher American National Bank of Indianapolis'' was not stricken out and the handwriting above it, ''W. C. Perkins, Chicago,'' was not on the note; that at the time he filled out and delivered the note the payee was shown as Fletcher American National Bank of Indianapolis; that he did not know who made the alteration, and that when it left his hands no alteration had been made. Defendants employed handwriting experts who made a series of photostatic enlargements and other exhibits in order to prove that the name ''W. C. Perkins'' had been written on the note by Messick. After the first handwriting expert had testified on behalf of defendants and had demonstrated that the name ''W. C. Perkins'' had been written on the note by Messick himself, Messick proceeded to retract his testimony and said that apparently he had been mistaken. Plaintiffs contend that the evidence shows that the liability of

the endorsers on the Robbins Body Corporation note was a syndicate obligation which was fully paid and settled. Messick testified that at the time the Robbins Body Corporation note was tendered to the Fletcher American National Bank,, Cushing was in Indianapolis, and that Cushing agreed with him that the pool would take over their liability on the note. Plaintiffs contend that the defendant was as much interested in keeping the Robbins Body Corporation a solvent and going concern as plaintiffs. Both parties quoted from the records of Brokaw and Company in support of their respective contentions. We find that the weight of the evidence supports the contention of defendant. The master found that the note remains unpaid; that it remains an asset of the syndicate account and that the endorsers are obligated to pay the face amount thereof plus the interest thereon, according to the tenor of the note. As to the testimony of Messick, the master found: "It appears from his testimony that Messick had not seen the original note, or a photostatic print thereof, from at or about its date until more than ten years thereafter. I am convinced that when he first testified as to the written words 'W. C. Perkins' and 'Chicago', Messick labored under a sincere misapprehension; that he was honestly mistaken in his testimony; that his first testimony as to the words 'W. C. Perkins' and 'Chicago' should be disregarded." We are unable to agree with this observation of the master. After viewing the photostatic copy of the note, Messick signed and swore to the amended answer to the cross bill. He then took the stand in order to support the defense that the note was invalid because it had been intentionally altered. To one not a handwriting expert, the words "W. C. Perkins" in the body of the note appear to be written by the same hand as the other writing on the note. Messick testified as to all phases on the transactions between the parties and his testimony

was of a positive character. He was, at least, reckless of the truth in making such a serious charge and this conduct impels us to accord slight credence to his testimony, except where it is corroborated. His testimony as to a conversation with Cushing at the Attic Club concerning the option, is better understood in the light of his testimony as to the supposed alteration of the note. Plaintiffs insist that in any event the acquisition of the note by the syndicate, in which plaintiffs were partners, extinguished plaintiffs' liability on the note, and support their argument by citing *Logan County Nat. Bank v. Barclay,* 104 Ky. 97, 46 S. W. 675. In that case it was held that when a note is acquired by a partnership and one of the partners is one of the makers, the obligation is extinguished by operation of law. This principle is embodied in the Illinois Negotiable Instruments Act (sec. 118, par. 140, ch. 98, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 89.140]), providing that: "A negotiable instrument is discharged: 1. By payment in due course by or on behalf of the principal debtor. 2. By payment in due course by the party accommodated, where the instrument is made or accepted for accommodation. 3. By the intentional cancellation thereof by the holder. 4. When the principal debtor becomes the holder of the instrument at or after maturity in his own right." The fourth clause does not apply to the case at bar because plaintiffs were not the principal debtors. They were secondarily liable as endorsers. It has been held that the particular methods described in the Negotiable Instruments Act for the discharge of an instrument excluded all other methods of discharge. Since the note was not discharged under any of the four clauses of the quoted section, there is no other way in which it can be discharged. Sec. 119 of the Illinois Negotiable Instruments Act (par. 141, ch. 98, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 89.141]) provides how a person secondarily liable on a nego-

tiable instrument is discharged. It will be remembered that in the instant case the maker was the Robbins Body Corporation. This maker never acquired ownership of the note. The contention of plaintiffs that their liability was extinguished by operation of law is without merit. They also contend that defendant is liable to the syndicate in the amount of the note for failure to use due diligence in collecting from the maker. The record shows that at the time the note was given in March, 1929, the Robbins Body Corporation was not considered to be a good risk even with the endorsements of plaintiffs. Messick was president of the Robbins Body Corporation. Any delay in attempting to collect the note was to the benefit of plaintiffs. We agree with the master's finding that ''Messick and Perkins at all times subsequent to the execution of the Robbins Body Corporation note, were under as great a duty to effect its payment as was Brokaw and Company to attempt to enforce its collection against the maker.''

Defendants maintain that the pool agreement of January 18, 1929, and the pool operations were contrary to public policy; that the contract is illegal and unenforceable, and therefore plaintiffs are not entitled to an accounting. This defense was not raised in the trial court. Defendants cite cases in support of their statement that where it appears that the contract sought to be enforced is against public policy, its validity is not waived by failure to plead it, and that such a defense may be urged for the first time in a reviewing court. (*Berge v. Berge,* 366 Ill. 228.) Plaintiffs do not challenge the statement that the point may be urged for the first time in a reviewing court. They do assert, however, that they are not barred from recovery on the grounds of public policy. They state that there is no evidence that the parties intended to participate in any manipulation of the market. Furthermore, they assert that if there was an attempt to manipulate the market there is no evi-

dence that plaintiffs had knowledge thereof. As the defense of illegality was not pleaded, the parties did not intentionally put in any evidence for or against such a contention. The record shows that at the time of the underwriting agreement whereby defendant took over 62,500 shares, the stock was worth $17.50 per share. The stock was listed on the Chicago stock exchange. Defendant, Brokaw and Company, which now asserts that the pool was for the purpose of manipulating the stock, employed persuasive salesmen because in a few days the stock which it had purchased for $17.50 was selling at $74. The day the pool agreement was signed, January 18, 1929, the stock was selling at as high as $121. It continued to climb until February 4, 1929, when it reached a ''high'' of $141. On February 18, 1929, it closed at $117; on March 28, 1929, it closed at $111; on April 30, 1929, it closed at $81; on May 31, 1929, it closed at $68.50; on June 29, 1929, it closed at $28.75, and on July 31, 1929, it closed at $26.50. The market prices are not given between July, 1929, and May, 1930. In May, 1930, the price was $16.75. On July 10, 1930, the closing price was $19.75. In September, 1930, the market price varied between $23 and $30⅞. The stock was at no time worth more than $17.50 a share, if it was worth that. Boosting the price to as high as $141 a share was not due to any increase in the real value of the stock as measured by assets and operations, but to manipulation of the market by plaintiffs and defendant. The record shows that the stock of the U. S. Corp. was given a fictitious value. This corporation was never in a sound position. It is surprising that the Chicago stock exchange permitted the public to be mulcted by such operations. We are of the opinion that through the stock that was sold by defendant to its individual customers, and the stock that was held by plaintiffs and defendant in their individual capacities and by them as members of the pool, and that which they controlled through options, they were able to manipu-

late and regulate the market. They did so. All of the three parties came off with handsome profits. The innocent outsiders were victimized by the operations of the pool and the individual operations of the parties to the pool. Plaintiffs were the officers and controlling parties in the operation of the U. S. Corp. They knew the intrinsic worth of that corporation. They knew that the stock was worth in the neighborhood of $17.50 per share. Plaintiffs and defendant sold this stock to the general public without any regard to its true value. We find that the pool agreement of January 18, 1929, and the operations of the plaintiffs and defendant were for the illegal purpose of regulating or controlling the market for their own profit and to the injury of the general public, and that such agreement and all such operations are contrary to public policy. The Robbins Body Corporation note represents $149,340.96 taken out of the pool account, and to allow the defendant to prevail in its counterclaim would be equivalent to recognizing the pool operations as valid. We are of the opinion that neither the plaintiffs nor the defendants should be allowed to use the processes of the courts for the purpose of enforcing the illegal contract.

Because of the views expressed, the decree of the superior court of Cook county is reversed and the cause is remanded with directions to dismiss the bill of complaint and the cross bill, and to tax the costs equally between plaintiffs and defendants.

*Reversed and remanded with directions.*

Mr. Presiding Justice Hebel, specially concurring: I am unable to agree with all that is stated in the opinion but concur in the court's conclusion.

Mr. Justice Denis E. Sullivan, specially concurring: I agree with conclusions but not with all that is said.