394 A.2d 958

ESTATE of Frances H. CAHEN (two cases) Pittsburgh National Bank, Co-Trustee under Revocable Agreement dated 12/28/39, amended 4/18/44 and supplement dated 10/5/53 with Robert Rosenthal. Appeal of Frances H. Cahen, Exceptant.

ESTATE of Phillis H. HELLER, now Rosenthal, Pittsburgh National Bank, Co-Trustee under Revocable Agreement dated 12/28/39, amended 4/18/44 and supplement dated 10/5/53 with Robert Rosenthal (two cases). Appeal of Phillis H. Heller, now Rosenthal, Exceptant.

ESTATE of Richard HELLER (two cases) Pittsburgh National Bank, Co-Trustee under Revocable Agreement dated 12/28/39, amended 4/18/44 and supplement dated 10/5/53 with Robert Rosenthal. Appeal of Richard Heller, Exceptant.

Supreme Court of Pennsylvania.

Argued Sept. 19, 1978.

Decided Nov. 18, 1978.

158

Decrees vacated insofar as approving award of principal commissions, and, in all other respects, affirmed.

William McC. Houston, Houston, Houston & Donnelly, Pittsburgh, for appellants at Nos. 280, 281 and 282 and for appellees at Nos. 286, 287 and 288.

Richard B. Tucker, Jr., Tucker, Arensberg & Ferguson, Pittsburgh, for appellant at Nos. 286, 287 and 288 and for appellee at Nos. 280, 281 and 282.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

Pittsburgh National Bank has tendered its resignation as corporate trustee of the on-going Frances Cahen, Phillis Heller, and Richard Heller Trusts. On the audit of Pittsburgh National's First and Transfer Accounts, the Orphans' Court Division of the Court of Common Pleas of Allegheny County entered three decrees awarding Pittsburgh National a total of $27,735 in commissions on principal and $7,500 in counsel fees. We agree with settlors Frances Cahen, Phillis Heller, and Richard Heller that the express terms of their trust agreements with Pittsburgh National preclude the award of principal commissions before termination of the trusts. Accordingly, we vacate that portion of each decree awarding Pittsburgh National principal commissions. But we do not agree that the orphans' court improperly awarded

Pittsburgh National counsel fees and therefore we affirm the decrees in all other respects.[1]

## I

In 1939, settlors entered into separate but substantially identical "trust agreements" with trustees Marcus Aaron and Pittsburgh National.[2] Under these trust agreements, Pittsburgh National agreed to administer the trusts settlors simultaneously created.[3] Article Twelve of the agreements fixes the corporate trustee's compensation:

"The compensation of [Pittsburgh National], based upon the gross income collected hereunder, shall be three and one-third (3⅓%) per centum, payable at the time or times the income is disbursed or invested hereunder, and upon the final termination of any trust hereunder, with respect to any part of the principal thereof, [Pittsburgh National] shall be entitled to receive additional compensation for its services hereunder upon the principal then being distributed, the amount of said compensation to be not less than one (1%) per centum nor more than three (3%) per centum of the market value of the securities and other property at

1. We hear these appeals pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(3), 17 P.S. § 211.202(3) (Supp.1978). Settlors are appellants at Nos. 280, 281 and 282 March Term, 1977. Pittsburgh National is the appellant at Nos. 286, 287, and 288 March Term, 1977. In its appeal, Pittsburgh National seeks more commissions on principal than the $27,735 the orphans' court awarded. In view of our disposition, we reject this claim. See infra Part III.

2. Fidelity Trust Company was the original corporate party to the trust agreements. In 1959, Fidelity and another institution combined to form Pittsburgh National Bank and Pittsburgh National assumed Fidelity's responsibilities under the trust agreement. We refer to the corporate fiduciary as Pittsburgh National throughout this opinion.

3. Each trust agreement provides settlors income during their respective lives and power to invade principal upon disability. Upon each settlor's death, the principal of the respective trusts is to be distributed to named beneficiaries. Each settlor reserves both the right to increase principal "from time to time" and the right to revoke the trust. Since 1939, the parties have twice revised the investment powers of the co-trustees, but have not otherwise altered the 1939 trust agreements. Each trust is presently active.

the time of such distribution. It is further understood and agreed that the amount of said additional compensation for services upon distribution of principal shall be approved by and satisfactory to Marcus Aaron or his successor Trustee appointed as hereinabove set forth."

From 1939 to 1956, Pittsburgh National received commissions on income for its services as corporate trustee. But beginning in 1956, Pittsburgh National attempted to renegotiate Article Twelve and thus increase its compensation. In 1958, following unsuccessful correspondence, Phillip Kerr, head of Pittsburgh National's trust department, wrote to settlors:

"Consistent with my responsibility as head of the Trust Department, the question of compensation and method of management in your trust has been brought to my attention for decision. As I hope Mr. Marshall has assured you, I too wish to assure you that our reasons for requesting an increase in compensation are based upon what we believe principles of fairness. We are nonetheless bound by the original agreement and have no choice but to comply with it unless you agree to a change."

For the next seventeen years, Pittsburgh National continued to serve and received only commissions on income, at the rate provided in the trust agreements.

In 1975, Pittsburgh National again sought to renegotiate Article Twelve. Pittsburgh National wrote to settlors that, in its view, "it is now in order to place your trust on [Pittsburgh National's] then current fee schedule." The correspondence further provided: "If you disagree we will take steps to resign immediately." Settlors disagreed, and in correspondence with Pittsburgh National insisted that if Pittsburgh National "is unhappy with the agreements made by its predecessor to such an extent that it has to resign, it must take the consequences."

Like the 1956–1958 negotiations, these negotiations also did not result in alteration of the rate of compensation

provided in the 1939 trust agreements. Pittsburgh National filed First and Transfer Accounts in the orphans' court, claiming more than $42,000 in commissions on principal and $7,500 in counsel fees.[4] Pittsburgh National filed separate "Petitions For Resignation and Discharge of Trustee" and Petitions For Distribution, in which it asked the orphans' court to confirm the accounts absolutely, approve its resignation, and transfer the balance of the trusts to the individual trustee. In exceptions to the First and Transfer Accounts, settlors challenged Pittsburgh National's present right to commissions on principal on the ground that, under the trust agreements, no principal commissions are to be awarded until termination of the trusts.

While the Auditing Judge found no justification for altering the express terms of the trust instruments,[5] he took the view that "[t]he fact that a trust agreement provides that a corporate trustee is to receive a certain per cent of principal at the termination of the trust does not bar an interim payment from principal on account." The Auditing Judge therefore awarded what he termed "reasonable compensation on the principal at the termination of [Pittsburgh National's] service as trustee," along with counsel fees. The orphans' court fixed the amount of "reasonable" compensation at a pro rata share of the maximum compensation possible under the trust agreements.[6] Both settlors and

4. The present individual trustee, Robert Rosenthal, did not join in these accountings and intends to continue to administer the trusts. Marcus Aaron, the individual trustee named in the trust agreements, died in 1954. Rosenthal became the individual trustee in 1975. There was no individual trustee from 1954 to 1975.

5. The Auditing Judge expressly rejected any argument that "economic changes since 1939 [(the year the parties entered into their trust agreements)] and the change in trust procedures render the trust impossible of fulfillment or so burdensome that this court would have the power to alter the express charges set forth plainly in the trust instrument." Rather, the court held that Pittsburgh National's "compensation is clearly set forth in the Deed of Trust."

6. The Auditing Judge calculated the percentage of the life expectancy of each trust the corporate trustee served:

Pittsburgh National filed exceptions to the Nisi Adjudication. The orphans' court dismissed the exceptions on the opinion of the Auditing Judge and these cross-appeals followed.

## II

Settlors contend that Pittsburgh National is entitled to principal compensation only in accordance with the terms of the trust agreements. According to settlors, the trust agreements preclude an award of commissions on principal until termination of the trusts. Settlors argue that the trust agreements do not permit Pittsburgh National, by an act of resignation while the trusts are still active, to accelerate its right to compensation on principal.[7]

| TRUST | EXPECTED DURATION | YEARS SERVED | PERCENTAGE |
|---|---|---|---|
| Richard Heller | 52.3 years | 37.5 years | 72% |
| Phillis Heller | 55.0 | 37.5 | 68% |
| Frances Cahen | 58.0 | 37.5 | 65% |

These percentages were then multiplied by the maximum rate of compensation possible under the trust agreements upon termination of the trust:

| TRUST | PERCENTAGE | COMPENSATION RULE | PRODUCT |
|---|---|---|---|
| Richard Heller | 72% | 3% | 2.16% |
| Phillis Heller | 68% | 3% | 2.04% |
| Frances Cahen | 65% | 3% | 1.95% |

This product was then multiplied by the market value of the trust assets:

| TRUST | PRODUCT | MARKET VALUE | COMMISSION |
|---|---|---|---|
| Richard Heller | 2.16% | $456,924.55 | $ 9,869.57 |
| Phillis Heller | 2.04% | 455,455.11 | 9,291.28 |
| Frances Cahen | 1.95% | 439,719.59 | 8,574.53 |
| | | TOTAL | $27,735.38 |

7. Settlors make two other arguments which, in view of our disposition, we need not address. First, settlors assert that Pittsburgh National's current attempt to recover principal commissions is a "replay" of the 1956–1958 negotiations. They argue that the corporate fiduciary "specifically acquiesced" in settlors' understanding in 1956–1958 that no compensation on principal is payable upon resignation. Settlors state that they were "lulled . . . into a false

Pittsburgh National responds that the trust agreements are silent regarding the corporate co-trustee's principal commissions upon resignation before termination of the trusts. Even though the trust agreements provide for payment of principal commissions "upon the final termination of any trust," Pittsburgh National argues that this silence permits payment of principal commissions on resignation before final termination of the trusts. In its cross-appeal, Pittsburgh National also disagrees with the orphans' court view of "reasonable compensation." In seeking more than the $27,-735 the decrees of the orphans' court awarded, Pittsburgh National argues that the contracts' rate of compensation on principal need not be followed.

Under 20 Pa. C.S.A. § 7185(a) (1975), an orphans' court "shall allow such compensation to the trustee as shall in the circumstances be reasonable and just . . . ." Section 7185(b) states: "[n]either the fact that a fiduciary's services has not ended nor the fact the trust has not ended shall be a bar to the fiduciary's receiving compensation for his services out of the principal of the trust." [8] But Section 7185(c) provides:

assumption of permanency, to [settlors'] detriment." According to settlors, the fiduciary is now "estopped" from seeking additional compensation.

Settlors also claim that, even if Pittsburgh National were entitled to commissions on principal, the orphans' court erroneously applied a three per cent rate of principal compensation in calculating Pittsburgh National's commissions. Under the trust agreements, the parties agreed to principal commissions of "not less than one (1%) per centum nor more than three (3%) per centum. . . ." But the parties further agreed that "the amount of said additional compensation for services upon distribution of principal shall be approved by and satisfactory to Marcus Aaron or his successor Trustee appointed as hereinabove set forth." Robert Rosenthal, the "successor Trustee," see supra note 4, did not approve the three per cent rate the orphans' court applied. Still assuming that the trustee can presently recover commissions on principal, settlors conclude that the corporate co-trustee is contractually bound to a maximum of one per cent principal commissions for service through termination of the trusts, and less than one per cent for the portion actually served.

**8.** This legislation, enacted in 1953, applies to all trusts created both before and after 1953. E. g., *Breyer Estate*, 475 Pa. 108, 379 A.2d 1305 (1977) (20 Pa. C.S.A. § 7185 governs rights and obligations of

*"Compensation prescribed by will or other instrument.—* Where the compensation of a fiduciary is expressly prescribed either by provisions of a will or deed of trust or other instrument under which he is acting or by provisions of an agreement between him and the creator of a trust, nothing in this section shall change in any way the rights of any party in interest or of the fiduciary."

■ Article Twelve of the trust agreements "expressly prescribe[s]" Pittsburgh National's commissions on principal. At the time settlors created their trusts, settlors and Pittsburgh National negotiated a comprehensive timetable for Pittsburgh National's compensation. Their writings provided that amounts "based upon the gross income collected" would be the exclusive form of compensation during the lives of the trusts. These commissions on income were to be "payable at the time or times income is disbursed" under the terms of the trust agreements. In contrast, "final termination of any trust," not particular services, activates Pittsburgh National's right to commissions on principal. These commissions, unlike commissions on income, are "additional compensation," to be calculated "at the time . . . of distribution." The trusts have not yet terminated and therefore, under the express terms of the trust agreements, Pittsburgh National cannot be awarded commissions on principal.

■ Pittsburgh National's argument, resting upon the silence of the compensation clause on the subject of principal commissions on resignation, must be rejected. The compensation clause must be viewed in light of the entire trust agreement. See e. g., *Shehadi v. Northeastern National Bank of Pennsylvania,* 474 Pa. 232, 378 A.2d 304 (1977) (writing must be interpreted as a whole, giving effect to all its provisions). Article Ten of the trust agreements provides:

trustee of 1934, 1954, and 1958 trusts). Section 7185 changed the common law rule which barred, absent unusual or extraordinary circumstances, a trustee's recovery of principal commissions during the life of a trust. E. g., *Williamson Estate,* 368 Pa. 343, 82 A.2d 49 (1951).

"The [settlor] reserves the right to appoint by an instrument in writing to be delivered to [Pittsburgh National], co-trustee hereunder, from time to time, an individual as co-trustee to succeed Marcus Aaron as Trustee hereunder, in the event of the death or resignation of said Marcus Aaron; and the [settlor] likewise reserves the right to appoint by an instrument in writing to be delivered to said [Pittsburgh National] an individual to act as co-trustee with it whenever any co-trustee hereunder shall have died, resigned or become incapable of performing his duties. Upon the acceptance in writing by such successor, the title to the trust property shall thereupon vest in him as co-trustee with said [Pittsburgh National]."

The parties foresaw the possibility of the individual trustee's "death or resignation" and therefore agreed to a mechanism for replacing him.

Yet the parties made no similar provision for the corporate trustee. In bargaining for and obtaining a corporate entity as a co-trustee, settlors sought and procured the services of an institution with theoretically perpetual life. As Professor Casner has observed,

"[i]f it becomes essential to change from one fiduciary to another before the fiduciary's work is completed, an interruption in the continuity of the supervision of the property results and this may be undesirable. Assurance of continuity of supervision is obtained by the selection of a corporate fiduciary."

Casner, II Estate Planning 1161 (3d ed. 1961). Settlors were therefore assured that their trusts would be administered by an institution capable of providing continuous services to supplement those of individual trustees. Both the absence of a clause providing for replacement of the corporate co-fiduciary and the settlors' selection of a corporate entity demonstrate the parties' intent that the corporate trustee would serve until termination of the trusts. Therefore, the parties' expectations are incompatible with a clause providing the corporate trustee principal compensation on resignation.

In *Breyer Estate*, 475 Pa. 108, 379 A.2d 1305 (1977), the trustee sought principal commissions while the trusts were active, even though the trustee, in agreeing with the settlor to administer the trusts, also agreed to commissions of "2% on the income as received and 1% on the principal at the termination of the trusts." This Court concluded:

> "[T]he parties intended to fix the amount and the timing of payments. Income commissions were to be paid 'as received' and the principal commission paid 'at the termination of the trust.' This express agreement bars payment of interim commissions from principal."

475 Pa. at 116, 379 A.2d at 1310. Here, as in *Breyer*, the parties by "express agreement" have "fix[ed] the amount and the timing of payments" of both income and principal commissions. Their trust instruments contain the express understanding and agreement that the corporate fiduciary would be paid principal commissions only at termination of the trusts. We therefore must agree with settlors that these express trust instruments foreclose a present award of principal commissions. A contrary conclusion would permit a corporate fiduciary, by unilateral action, to depart from the express terms of trust contracts, alter the contracts' timetable for principal commissions, and abrogate settlors' careful trust plans.[9]

9. Pittsburgh National cites *Reed Account*, 467 Pa. 371, 357 A.2d 138 (1976), for the proposition that a trust agreement silent on principal compensation to be awarded a resigning corporate fiduciary does not foreclose an award of reasonable principal compensation. In *Reed*, a testator's will specified the trustee's commissions on income, but did not specify what amount was to be paid on principal. The individual trustee died before termination of the trust. We concluded that 20 Pa.C.S.A. § 7185 authorized the orphans' court to award the trustee's estate principal commissions from the active trusts. Here, however, the parties' trust instruments express their agreement that the corporate trustee cannot recover principal commissions until the trust terminates, and the bargain that the corporate fiduciary would serve until termination of the trusts. On these facts, *Reed* is inapposite.

Other cases Pittsburgh National cites do not support its view. In *Kennedy Trust*, 364 Pa. 310, 72 A.2d 124 (1950), both the estate of the deceased individual co-trustee and the corporate trustee recovered principal commissions on a portion of the corpus of the active trust which settlor and his wife had withdrawn. But, as in *Reed* and

Pittsburgh National suggests that it would be "inequitable" to deny it commissions on principal for its years of service as corporate trustee. But it makes no claim that it has not been paid income commissions in accordance with the terms of the trust instruments. Nor does Pittsburgh National mention the burden its resignation places upon the trusts. Present payment of principal commissions contravenes the express terms of the trust agreements and thwarts settlors' express plan not to invade corpus for payment of principal commissions until termination of the trusts. Pittsburgh National's failure to serve through the lives of the trusts places settlors in a position which their 1939 agreements were designed to avoid. All these consequences are imposed by a corporate fiduciary, in which settlors justifiably placed their greatest confidence. See *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (Cardozo, J.) ("[a] trustee is held to something stricter than the morals of the market place"); see also *Killey Trust*, 457 Pa. 474, 326 A.2d 372 (1974) (corporate fiduciary procuring appointment by representing its greater than ordinary skill held to represented standard). In these circumstances, present recovery is unjustified.[10] Those portions of the

unlike here, no provision of the trust agreement fixed the timing of payments of principal commissions. *Ehret Estate*, 427 Pa. 584, 235 A.2d 414 (1967), *Snyder Estate*, 346 Pa. 615, 31 A.2d 132 (1943), and *Bosler Estate*, 161 Pa. 457, 29 A. 57 (1894) state the general rule that "the labor, care and responsibility pertaining to the conservation of the capital itself are properly a charge on it [(the capital)], and are to be deducted from it when the trust expires or the particular trustee's relation to it ends," *Bosler Estate*, 161 Pa. at 462, 29 A. at 60, but do not involve instances where "the particular trustee's relations to it ends." Finally, *McCaskey Estate*, 307 Pa. 172, 160 A. 707 (1932), states the above rule in a case where a testator's will was read to authorize payment of commissions, to a resigning individual co-trustee, on the corpus from accruing income. The trust agreements in the present case, however, contain express provisions that principal commissions are to be paid only upon termination of the trusts.

**10.** Neither Pittsburgh National nor the orphans' court expressly rely upon a theory of "unjust enrichment," and on this theory, these decrees could not stand. Pittsburgh National bargained with settlors and agreed to perform through the termination of the trusts under a specified timetable of compensation, but now has chosen not to adhere to the bargain. Pittsburgh National is therefore a "breaching

decrees of the orphans' court awarding present payment of principal commissions must therefore be vacated.

## III

Because we conclude that the trust agreements expressly foreclose present payment of commissions on principal, we must, of course, reject Pittsburgh National's argument that the orphans' court erred in not awarding it more principal commissions. We also reject settlors' contention that Pittsburgh National is not entitled to counsel fees in connection with the filing of accounts for audit. Under 20 Pa.C.S.A. § 7181, "[a] trustee shall file an account of his administration at the termination of the trust and may file

plaintiff." Assuming that a breaching fiduciary may recover in unjust enrichment, recovery could be justified only if the requirements set forth in Section 357 of the Restatement of Contracts (1932) were satisfied.

Section 357 provides:

"RESTITUTION IN FAVOR OF A PLAINTIFF WHO IS HIMSELF IN DEFAULT

(1) Where the defendant fails or refuses to perform his own contract and is justified therein by the plaintiff's own breach of duty or non-performance of a condition, but the plaintiff has rendered a part performance under the contract that is a net benefit to the defendant, the plaintiff can get judgment, except as stated in Subsection (2), for the amount of such benefit in excess of the harm that he has caused to the defendant by his own breach, in no case exceeding a ratable proportion of the agreed compensation, if

(a) the plaintiff's breach or non-performance is not wilful and deliberate; or

(b) the defendant, with knowledge of the plaintiff's breach of duty or non-performance of condition has occurred or will thereafter occur, assents to the rendition of the part performance, or accepts the benefit of it, or retains property received although its return in specie is still not unreasonably difficult or injurious."

\*     \*     \*     \*     \*     \*

Even assuming that the prerequisites set forth in subsections (1)(a) or (1)(b) were satisfied here, Pittsburgh National still has not demonstrated that the trusts have incurred a "net benefit  .  .  .  in excess of the harm that he has caused to the defendant by his own breach." Moreover, a present showing of "excess benefit" would require speculation concerning both the value of services rendered and "harm caused" to settlors. As comment g to Section 357 points out, "[t]he plaintiff's right to restitution is merely to the excess of benefit received over the harm suffered. It is necessary for the plaintiff to show with a reasonable degree of certainty that there is an excess and its amount, in order to get judgment."

an account at any other time." Pittsburgh National's filing of accounts upon resignation was therefore an authorized and appropriate measure. See also e. g., *Band Estate*, 182 Pa.Super. 8, 124 A.2d 498 (1956) (resigning trustee advised to file account for audit). Pittsburgh National's accounting advanced orderly administration of these trusts. Settlors do not dispute the reasonableness of the fees and these were Pittsburgh National's first accounts. On this record, we find no basis for disturbing the orphans' court award of counsel feels for filing the accounts.

Decrees of the orphans' court vacated insofar as they approve present award of principal commissions. In all other respects, decrees affirmed. Each party pay own costs.

POMEROY, J., concurs in the result.