In re LIBERTY MUSIC & VIDEO, INC., Debtor.

FREE–TAN CORP., Plaintiff,

v.

49–50 ASSOCIATES, Defendant.

Bankruptcy No. 83 B 11023 (PBA). Adv. No. 85–5222A.

United States Bankruptcy Court, S.D. New York.

Nov. 12, 1985.

Jaffe & Segal, New York City, for 49–50 Associates.

Kramer, Levin, Nessen, Kamin & Frankel, New York City, for Free-Tan Corp.

## MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISQUALIFY COUNSEL

PRUDENCE B. ABRAM, Bankruptcy Judge:

A motion to disqualify substituted counsel for Free-Tan Corp. ("Free-Tan") has been made in this removed action (hereafter the "Default Action") originally commenced by Free-Tan in the Supreme Court, County of New York in late January 1985 against 49–50 Associates ("49–50" or "Defendant"). Free-Tan sought in the Default Action to obtain a declaration that it was not in default in its obligations as tenant under a lease for certain store premises located in the Newsweek Building at 450 Madison Avenue, New York, New York (the "Store Premises"). The landlord of the Store Premises is 49–50, which is a limited partnership in which a Mr. Richard A. Bernstein, whose connections with substituted counsel are discussed below, is a general partner. Among the grounds which had been asserted by 49–50 as a default under the lease was the failure of

Free-Tan to complete all Local Law 5 work, a burden placed on Free-Tan by the terms of this court's order of February 17, 1984, which was recently affirmed on appeal. See Footnote 2. On February 14, 1985, 49–50 removed the Default Action to the Bankruptcy Court.[1]

Free-Tan acquired the lease rights to the Store Premises from Liberty Music and Video, Inc., a Chapter 11 debtor, pursuant to authority granted by order of this court dated October 21, 1983. 49–50 had strenuously objected to the assignment of the lease to Free-Tan, which objections were overruled by the court after several days of hearings. Free-Tan did not close the lease transaction with Liberty until on or about January 5, 1984. A substantial amount of litigation between 49–50 and Free-Tan eventuated both before and after the lease assignment closing. Indeed at the time the present action was removed to the bankruptcy court, there were three appeals pending from orders that fixed and determined rights between 49–50 and Free-Tan and that were entered by the bankruptcy court subsequent to the October 21, 1983 assignment approval order.[2]

The firm of Schekter Aber Rishty & Goldstein, P.C. (the "Schekter Firm") is

---

1. The adversary caption on the original removal petition treats 49–50, the maker of the removal motion, as the plaintiff, and Free-Tan as the defendant. As it would appear preferable to treat the parties as plaintiff or defendant according to the status they had in the removed action, this opinion will adopt that convention.

By application for removal filed August 5, 1985, 49–50 removed a second action from the state court. The second removed action is also captioned *Free-Tan Corp. v. 49–50 Associates*, Supreme Court, New York County and bears Index No. 18013/85. In this second action, Free-Tan sought a declaration that the selling of pantyhose was not a violation of the lease for the Store Premises and a *Yellowstone* injunction pending the determination. The state court issued a temporary restraining order in Free-Tan's favor permitting the sale of pantyhose prior to the removal of the action. On August 13, 1985, after a hearing, this court dissolved the temporary restraining order effective August 15 and denied the request for a preliminary injunction.

2. On June 18, 1985, District Judge Knapp dismissed the appeal from this court's order of May 9, 1984 which had enjoined Free-Tan from

using the Madison Avenue store "for the conduct or operation of any business unless and until the store was appropriately and permanently fixed for a high grade and respectable operation or until such time as Free-Tan obtain[ed] the landlord's consent in writing to any temporary or permanent use of the premises." The District Court found no merit in Free-Tan's arguments on the appeal and granted the landlord's request for attorney's fees under Federal Rule of Civil Procedure 11. The matter stands remanded to this court for determination of what amount would represent 49–50's reasonable expenses incurred in defending the appeal, including reasonable attorney's fees.

By opinion dated October 10, 1985, District Judge Connor affirmed this court's order of February 17, 1984, which, *inter alia*, imposed the obligation of complying with Local Law No. 5 on Free-Tan, but did not resolve the issue of who would ultimately bear the cost of compliance. Judge Connor denied the landlord's motion for expenses under Fed.R.Civ.Pro. 11 in connection with that appeal.

listed as the attorneys for Free-Tan in the summons in the State Court Action. The Schekter Firm had represented Free-Tan during the hearings leading up to the October 21, 1983 order approving the lease assignment and the many hearings thereafter. In the late spring of 1984, Fensterheim & Fensterheim joined with the Schekter Firm in the representation of Free-Tan.[3]

On March 19, 1985 and in connection with the Default Action, there was filed with this court a stipulation and consent to substitute attorneys pursuant to which the firm of Kramer, Levin, Nessen, Kamin & Frankel (the "Kramer Firm") replaced the Schekter Firm as Free-Tan's attorneys. The Kramer Firm has represented Free-Tan's corporate parent and various affiliates in substantial real estate and litigation matters since 1978. Fourteen of the present partners of the Kramer Firm, as well as a partner who has withdrawn from the firm and the widow of a deceased partner, are limited partners in 48–48 Associates ("48–48"), a New York limited partnership in which Mr. Bernstein is a general partner. 48–48 is the owner and landlord of 48 West 48th Street, New York City, a property a few blocks away from the Store Premises.

It appears that approximately one year prior to the present substitution of counsel the Kramer Firm had been asked to represent Free-Tan in its disputes with 49–50 relative to the Store Premises and had declined to do so. As explained by Mr. Harvey Friedman, a partner in the Kramer Firm, the retention was then declined because

<hr/>

**3.** The name of the Schekter firm appears on Judge Connor's Opinion. However, it appears that the Fensterheim Firm represented Free-Tan in the appeal decided by Judge Knapp. On the appeal to the Second Circuit from Judge Knapp's decision, Free-Tan is being represented by the firm of Anderson Russell Kill & Olick, P.C.

**4.** Prior to the disqualification motion, another Kramer Firm attorney, Mr. Alan R. Friedman, made the following statement at a hearing before the court on March 20, 1985:

"At that time, my relationship with Mr. Bernstein [relative to 48–48] was particularly contentious and I declined the representation—not out of any concern for Mr. Bernstein, but because I did not want Free-Tan to bear the brunt of Mr. Bernstein's hostility toward me in any negotiation between 49–50 and Free-Tan." Affidavit of Harvey L. Friedman Sworn to April 28, 1985 at ¶ 13.[4]

Promptly after the substitution and by motion dated April 16, 1984, 49–50 moved for an order disqualifying the Kramer Firm and "precluding them from acting in any capacity as attorneys for Free-Tan Corp., in this or any related proceedings between the parties." The motion was supported by an affidavit by Stuart Turner, who is employed by P & E Properties, Inc. ("P & E") and responsible for its financial operations. P & E is the managing agent for the properties owned by 49–50 and 48–48, as well as other properties in which Mr. Bernstein has an interest. The offices of P & E are in the Newsweek Building, the building in which the Store Premises are located.

The Kramer Firm has opposed the disqualification motion. Alan A. Ades, the president of Free-Tan, has submitted an affidavit in which he states that he is aware of the facts alleged by 49–50 in the disqualification motion and expressly consents to the Kramer Firm's representation of Free-Tan.

The facts underlying the disqualification motion, although somewhat involved, are not in substantial dispute. At the outset, it should be stated that 49–50 concedes that the Kramer Firm does not now and has not in the past represented it in any matter.

"I would point out though, and correct the record on one fact, which is that I understand it and have understood it previously, the reason that Mr. Harvey Friedman declined this representation a year ago was a fear or a concern that because as partners * * * limited partners[,] in another entity we [the partners in the Kramer Firm] were sometimes adversaries of Mr. Bernstein, that in fact that our presence with respect to Free-Tan might somehow or other prejudice Free-Tan because Mr. Bernstein regarded us as an adversary." Transcript, 3/20/85 at 17–18.

That concession removes the present motion from the typical disqualification motion.

Since the facts are essential to the court's conclusion that the disqualification motion is well-founded and should be granted, the facts will be laid out in some detail. 49–50 is a New York limited partnership in which, as noted above, Mr. Richard A. Bernstein is a general partner, and also owns an equity interest. Mr. Bernstein is also a general partner and holder of a substantial equity interest in 48–48, the limited partnership in which a substantial number of Kramer Firm partners are limited partners. The Kramer Firm partners together own 50% of the partnership interests in 48–48.[5] Mr. Bernstein owns 50% of the stock of P & E. P & E, as stated above, manages both the 49–50 and 48–48 properties.

Because of their relationship as partners in 48–48, Mr. Bernstein, either directly or through representatives such as Mr. Turner, and the Kramer Firm partners necessarily engage in discussions of 48–48's business affairs. Further, as limited partners, the Kramer Firm partners must rely on the general partners,[6] one of whom is Mr. Bernstein, for their profit and the protection of their investment. According to the Turner Affidavit, distributions were made from 48–48 to the Kramer Firm limited partners of $1,849,820 over the past two years. Turner Affidavit at ¶ 12.

The only area of factual dispute between the Kramer Firm and 49–50 respecting the disqualification motion concerns the timing and content of conversations during early 1985 between Harvey Friedman, a Kramer Firm partner, and Mr. Bernstein. In the court's view, the precise details of the conversations are not material to the motion. It is sufficient that both sides agree that the conversations related to business matters respecting 48–48 and the limited partners and may have included discussions which touched on the Newsweek Building, the property owned by 49–50 in which the Store Premises are located.

Additional entanglements exist between Mr. Bernstein and the Kramer Firm. Amelia Bernstein, who is Mr. Bernstein's wife and a limited partner of 49–50, is also a limited partner of another entity known as PCH Associates ("PCH"). The Kramer Firm has in the past represented the limited partners of PCH, including, Mrs. Bernstein, in certain matters regarding PCH and was actively involved in negotiations with Mr. Bernstein respecting the limited partners. The general partner of PCH Associates is Bernstein Corp. Mr. Bernstein and Mr. Turner are the sole stockholders of Bernstein.

Two partners of the Kramer Firm were formerly affiliated with the firm of Gelberg & Abrams (the "Gelberg Firm"). A founding member of the Gelberg Firm was Saul Kronovet. Mr. Kronovet, who was killed in an accident in 1982, was a close personal friend of Mr. Bernstein and was intimately involved with Mr. Bernstein's acquisition of the Newsweek Building and its on-going management. After Mr. Kronovet left the Gelberg Firm, he occupied offices he leased at the Kramer Firm, although he was not affiliated with the firm.

---

5. Although less than 50% of the Kramer Firm's present partners are limited partners of 48–48, the percentage of Kramer Firm partners investing at the time the investment was made in or about 1975 was higher. The dilution in percentage is a result of the ebb and flow of partners. Moreover, it is clear that 48–48 was sought out as an investment vehicle for the Kramer Firm partners as part of the Firm's activities. This case is not one in which one, or even several, partners of a law firm have independently come to invest in a particular venture for reasons unconnected with the firm.

6. Under New York law, a limited partner has the right to have on demand
 "true and full information of all things affecting the partnership, and a formal account of partnership affairs whenever circumstances render it just and reasonable * * * *"
McKinney's Partnership Law § 99(1)(b). A limited partner is not liable to creditors, as is a general partner, unless in addition to the exercise of his rights and powers as a limited partner he takes part in the control of the business. See McKinney's Partnership Law § 96. See also McKinney's Partnership Law § 26 which defines the nature of a general partner's liability.

Jaffe & Segal, the attorneys which have represented 49–50 throughout the Liberty Music Chapter 11 case, have also represented 48–48 in the past in certain litigation in which it was involved. That litigation was successfully concluded on appeal.

No claim is made that the businesses of 49–50 and 48–48 are identical or commingled. However, management essentially stems from the same location. There is a single computer and computer system for the various properties managed by P & E. Similar vendors are used. The same attorneys and accountants are used for both 49–50 and 48–48. A single insurance policy covers both properties.

As Mr. Turner's affidavit puts it:

"Kramer Levin in effect relies upon Mr. Bernstein and his organization to make their profit for them and to protect their investment. * * * The contacts between Richard A. Bernstein and the Kramer Levin firm are numerous and pervasive. * * * Indeed, and in fact, as partners of Associates, the parties have *fiduciary obligations* to each other. * * * It is often difficult to articulate what it is about conduct that makes it inappropriate or unseemly, or to appear to be so. In some instances, we know it when we see it, even if we can't describe it. In this instance, it is respectfully submitted, the complained of conduct not only appears, but is inappropriate and unseemly." Affidavit of Stuart Turner sworn to April 16, 1985 at ¶¶ 11, 23 and 24.

There is a fundamental contradiction between the reliance of the Kramer Firm partners on Mr. Bernstein for 48–48's profit, on the one hand, and the Kramer Firm's opposition to Mr. Bernstein on behalf of Free-Tan relative to the Store Premises, on the other hand.

 This court has concluded, for the reasons which follow, that the Kramer Firm is disqualified from representing Free-Tan even though Free-Tan has consented to the representation after being advised of the facts. Disciplinary Rule 5–101(A) of the American Bar Association's Code of Professional Responsibility (the "Code") provides:

"Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

The Code has been adopted by the New York State Bar Association and its canons are recognized by both Federal and State courts as appropriate guidelines for the professional conduct of New York lawyers. See *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir.1976); and *Matter of Weinstock*, 40 N.E.2d 1, 351 N.E.2d 647, 386 N.Y.S.2d 1 (1976). Although a court should generally respect the consent by the client to such a representation, the court is not bound to do so and may substitute its own judgment respecting the propriety of the representation. Likewise the issue may be raised by the adversary as well as the client. See *Greene v. Greene*, 47 N.Y.2d 447, 452, 391 N.E.2d 1355, 418 N.Y. S.2d 379 (1979).

The relations between the Kramer Firm and Mr. Bernstein have evinced the mercurial qualities typical of all human relationships. A year ago the Kramer Firm thought that the state of its relationship with Mr. Bernstein could adversely affect Free-Tan's interests. Today's apparently improved state could alter again in the future. Thus, the Kramer Firm's present evaluation of the condition of the relationship must carry little weight in consideration of the disqualification motion since disqualification is required if the lawyer's professional judgment is or *reasonably may be* affected.

The crux of the matter must lie in the legal, financial and business nature of the ties between the Kramer Firm, its partners and Mr. Bernstein. These ties are the impediment to the Kramer Firm's present and future ability to exercise its independent professional judgment on behalf of Free-Tan. The magnitude of the financial interests of the Kramer Firm limited partners in

48–48 ($1.8 million in two years) dwarfs the financial interest of the Kramer Firm in the fees to be earned for representing Free-Tan in the Store Premises ($100,000 or less). Nor, as set forth above, is 48–48 the sole link between the Kramer Firm and Mr. Bernstein.

The relationship between the Kramer Firm partners and Mr. Bernstein is a fiduciary one, as well as a significant financial one. See *Riviera Congress Associates v. Yassky*, 18 N.Y.2d 540, 223 N.E.2d 876, 277 N.Y.S.2d 386 (1966) ("There can be no question a managing or general partner is bound in fiduciary relationship with the limited partners."); *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 548 (1928) ("Many forms of conduct permissible in a workday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior."); and *Greene v. Greene*, 47 N.Y.2d 447, 453, 391 N.E.2d 1355, 418 N.Y.S.2d 379 (1979) ("As former partners in defendant lawfirm, Grutman and Bjork owe a fiduciary obligation similar to that owed by an attorney to his client * * *.").

As the New York Court of Appeals has stated:

"It is a long-standing precept of the legal profession that an attorney is duty bound to pursue his client's interests diligently and vigorously within the limits of the law (Code of Professional Responsibility, Canon 7). For this reason, a lawyer may not undertake representation where his independent professional judgment is likely to be impaired by extraneous considerations. Thus, attorneys historically have been strictly forbidden from placing themselves in a position where they must advance, or even appear to advance, conflicting interests (see, e.g., *Cardinale v. Golinello*, 43 N.Y.2d 288, 296 [372 N.E.2d 26, 401 N.Y.S.2d 191]; *Eisemann v. Hazard*, 218 N.Y. 155, 159 [112 N.E. 722]; Code of Professional Responsibility, DR 5–105). *This prohibition was designed to safeguard against not only violation of the duty of loyalty owed the client, but also against abuse of the adversary system and resulting harm to the public at large.*" *Greene v. Greene*, 47 N.Y.2d 447, 451, 391 N.E.2d 1355, 418 N.Y.S.2d 379. (Emphasis added).

Compare *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir.1976) ("a lawyer's duty to his client is that of a fiduciary or trustee.").

Disqualification necessarily interferes with Free-Tan's selection of an attorney of its own choice. However, Free-Tan's right to counsel of its own choice is not limitless.

"The attorney may not accept employment in violation of a fiduciary relationship and may not allow his own interests to conflict with those of his client. To hold otherwise would be to ignore the overriding public interest in the integrity of our adversary system." *Greene v. Greene, supra*, 47 N.Y.2d at 453, 391 N.E.2d 1355, 418 N.Y.S.2d 379.

Compare *General Motors Corporation v. City of New York*, 501 F.2d 639, 650 (2d Cir.1974) ("Indeed, the question of 'side-switching,' and of the conflict of interest which is almost certain to arise when counsel changes sides is addressed by Canon 4 and not Canon 9. * * * The ethical problem raised here, we repeat, does not stem from the breach of confidentiality bred by a conflict of interest but from the possibility that a lawyer might wield Government power with a view toward subsequent private gain.").

■ Each case must be decided on its own facts. All doubts should be resolved against the representation. See Illinois State Bar Association Committee on Professional Responsibility, Opinion 870 (4/27/84). Here there is not just one involvement between the Kramer Firm's partners and Mr. Bernstein; there are many different entanglements. It is evident that the Kramer Firm considered the disqualification issue and evaluated it differently than the court. This decision is

not intended to reflect on the integrity of the Kramer Firm. The court has concluded that the Kramer Firm undertook a representation of Free-Tan, a longstanding client of the firm, only after consideration of the ethical problem and at the request of the client. However, the adversary process functions best when counsel for a party is able to pursue a client's case without any impediment on its loyalty.[7]

The motion to disqualify the Kramer Firm is granted. Free-Tan is directed to obtain substitute counsel within twenty (20) days. It is so ordered.

---

7. The Kramer firm has also pointed to certain negotiations it conducted for others with Mr. Bernstein and Mr. Bernstein's lack of objection to that representation. It is apparent that there is a difference between matters involving representation in court proceedings and those that do not. In a face-to-face negotiation, both sides are free to give or not as they desire and the transaction is conducted in private. By contrast, in litigation, the decision is made by a third party, the judge, in a public forum and systemic concerns are greater. In any event, this court is not prepared to find that the prior lack of objection somehow estops Mr. Bernstein and 49–50 from raising the issue at this time.